UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
--------------------------------------------------------X
JOHN GRENAWALT, CARLOS MIRANDA,
and JULIO ALICEA, on behalf of themselves
and all others similarly situated,                    Docket No.: 11-CV-2664(ALC)


                    Plaintiffs,

- against -

AT&T MOBILITY LLC; ALPHA-OMEGA
PROTECTION SERVICES CORP.;
GRACE M. DEPOMPO,
GLADIUS PROTECTION, INC.; and
CENTURIA, INC.,

                    Defendants.
--------------------------------------------------------X

**Plaintiffs' Response to Defendants' Local Rule 56.1 Statement**

95. Gladius is a security company that provides, inter alia, security guard protection for retail businesses.  See Ex. 1, Isham Decl. at ¶4.

Response: Admitted.

96. Though Gladius is based in Texas, it has customers nationwide.  Id.

Response: Admitted.

97. From time to time, Gladius uses independent contractors to staff the security guard needs of its customers outside of Texas.  Id.

Response: Admitted.

98. Over the years, certain of AT&T's stores have requested an on-site security presence to deter theft and other unwanted behavior during the holiday season, during special events or in other instances.  See PX52, Santos Tr. at 15:4-13, 24:23-25:5.

Response: Admitted.

99. After receiving such requests from the New York market, AT&T, along with others in the organization with responsibility for the New York market, began reviewing AT&T's options, including hiring directly from the police force or going through one of AT&T's preexisting vendor relationships (e.g. Securitas, a competing security vendor).  Id. at 18:24-19:9.

Response: Admitted.

100. During this process, AT&T met with several different vendors, including Gladius, which had been providing security services to AT&T in other geographic areas.  Id. at 21:20-21:5.

Response: Admitted.

101. Ultimately, in or about 2006, based on the level of service Gladius represented its guards would provide, the level of service Gladius indicated it would provide to AT&T and Gladius' pricing, AT&T entered into an agreement with Gladius to provide security to certain of AT&T stores in the New York market.  Id. at 22:25-23:18.

Response: Admitted.

102. In connection with its agreement with AT&T, in or about October 2006, Gladius approached DePompo about recruiting off-duty and retired police officers to provide security services to AT&T stores in the New York and New Jersey markets.  See PX47, DePompo Tr. 1 at 8:3-11:15.

Response: Denied.  In October 2006, DePompo was approached by Joe Branch and Herbert Isham, representing Gladius Protection Inc., not Gladius Inc.  PX47 8:3-11:15, 13:20-14:3, 19:19-25, 62:5-8

103. DePompo agreed, and began coordinating security services at temporary locations in

December 2006.  Id. at 16:9-16:18.

Response: Admitted.

104. Almost a year later, in or about September 2007, DePompo formed Alpha-Omega

Protection Services Corp, or "A-O."  Id. at 42:7-42:19.

Response: Admitted.

105. In June of 2008, Gladius formally engaged A-O as an independent contractor to provide

security guards for AT&T retail stores in the New York metropolitan area and parts of New

Jersey.  Ex. 1, Isham Decl. at ¶¶5-6; Ex. 1-B, the ICA; PX39, the ICA.

Response: Denied.  Gladius Inc. engaged A-O "a couple of months" prior to March of 2008,

when it began submitting invoices to AT&T, rather than Gladius Protection Inc.  (PX20; PX 52

14:14-23, 159:12-160:10; PX 48 68:10-14).

106. The ICA, by and between Gladius and A-O and its president, DePompo, sets forth terms

by which the A-O Defendants would provide "security services" for one of Gladius' customers.

See Ex. 1-B, the ICA at opening preamble.

Response: Denied.  The ICA does not set forth any of the specific terms by which the A-O

defendants would provide security services to Gladius' customers.  It does not, *inter alia,* state

where the services would be performed, by whom they would be performed, what kind of

security services would be performed, or any other requirements of the performance.

107. Although not specifically stated in the ICA, Gladius paid A-O a coordination fee of $5

for each hour of security services billed to Gladius.  See PX48, DePompo Tr. 2 at 38:16-38:22.

Response: Admitted.

108. Pursuant to the ICA, A-O and DePompo (collectively, the "A-O Defendants") regularly

contracted with no less than eighty guards to provide security services to approximately twenty-three AT&T stores in New York and New Jersey.  PX47, DePompo Tr. 1 at 49:9-50:2, 72:16-73:5.

Response: Admitted, except that the services provided by A-O and DePompo were not provided pursuant to the ICA.  Those services pre-dated the ICA, *see* ¶¶ 102-103 herein. The ICA also makes no mention of the coordination fee to be paid DePompo (PX39; PX46 44:4-10) and does not say that Depompo or A-O would be providing armed guards to the AT&T stores, the central purpose of their relationship with Gladius. (PX39, PX46 64:14-65:3).

109. Carlos Miranda, John Grenawalt and Julio Alicea (together the "Plaintiffs") are all former law enforcement officers who have, for at least the past five to six years, worked part-time or full-time as security guards at various entities, including AT&T.  See PX54, Miranda Tr. at 19:1-10, 48:7-14; PX56, Grenawalt Tr. at 14:17-16:9; PX57, Alicea Tr. at 31:7-33:21.

Response: Admitted.

110. Many of the guards worked pursuant to an Independent Contractor Agreement and Confidentiality Agreement that they entered into with A-O.  PX47, DePompo Tr. 1 at 155:24-157:18; see also Wahby Decl. at Exhibit 2, various independent contractor agreements between A-O and the security guards ("Security Guard ICAs").

Response: Denied.  Exhibit 2 to Mr. Wahby's deposition are not admissible evidence, as required by Local Rule 56.1(d).  The exhibit is not authenticated by affidavit or testimony of anyone with personal knowledge.  In addition, these documents were never produced to Plaintiffs in the course of the discovery in this matter.  PX47 157:16-23.  There is also no

evidence that each of the individuals with purported records in that exhibit actually worked as security guards

111. A-O paid some of these guards through a Form W-2, and others, like the Plaintiffs, as independent contractors through a Form 1099. See Mem. of Law in Support of Pls.' Motion for Summary Judgment and Class Certification ("Motion"), at p. 8.

Response: Denied. Carlos Miranda was paid on a W-2 for part of his employment. PX 54 62:5-11.

112. Some guards were paid through A-O's payroll system, ADP, and others were paid out-of-pocket directly by DePompo. See PX48, DePompo Tr. 2 at 50:20-50:24, 54:06-54:07.

Response: Admitted, except to add that the guards not payed through the payroll system were those recently hired who had not been added to the system. *Id.*

113. Gladius properly terminated the ICA in February 2011 pursuant to the provisions found in Article 2 of the ICA. See Ex. 1, Isham Decl. at ¶7; Exhibit 1-C to the Isham Decl., the February 25, 2011 termination email from Isham to DePompo; Ex. 1-B, the ICA at §2.2.

Response: Admitted.

114. At the time of termination, Gladius had paid the A-O Defendants millions of dollars in coordination fees and guard-related invoices over the life of the ICA. See Ex. 1, Isham Decl. at ¶7.

Response: Admitted.

115. Gladius terminated the ICA, in part, after discovering that the A-O Defendants had been grossly overbilling Gladius under the terms of the ICA. See id. at ¶9.

Response: Denied. The ICA is unclear whether the "25 New York/30 New Jersey" language

relates to the money to be paid to the guards, or the money A-O was to be reimbursed for the guards' services.  PX39.

116. The ICA incorporates by reference a Compensation Agreement that establishes the rates the A-O Defendants were to pay for armed security guards.  Id. at ¶8.

Response: Denied.  The ICA is unclear whether the "25 New York/30 New Jersey" language relates to the money to be paid to the guards, or the money A-O was to be reimbursed for the guards' services.  PX39.

117. Pursuant to this agreement, the A-O Defendants were to pay no more than $25.00 per man hour for New York officers and $30.00 per man hour for New Jersey officers.  Id.; see also PX46, Isham Tr. at 45:6-46:12, 55:5-55:8.

Response: Denied.  The ICA is unclear whether the "25 New York/30 New Jersey" language relates to the money to be paid to the guards, or the money A-O was to be reimbursed for the guards' services.  PX39.

118. Under no circumstances were the A-O Defendants allowed to bill Gladius more than what the A-O Defendants were paying to the security guards.  See Ex. 1, Isham Decl. at ¶8; PX46, Isham Tr. at 45:6-46:12, 55:5-55:8.

Response: Denied.  The ICA is unclear whether the "25 New York/30 New Jersey" language relates to the money to be paid to the guards, or the money A-O was to be reimbursed for the guards' services.  PX39.

119. Instead, to compensate the A-O Defendants for providing armed guard services, Gladius paid the A-O Defendants a coordination fee of $5 per man hour for each guard placed with AT&T.  See Ex. 1, Isham Decl. at ¶8; PX47, DePompo Tr. 1 at 136:21-137:20; PX46, Isham Tr.

at 42:13-43:9.

Response: Admitted, except for the word "instead."  The ICA is unclear whether the "25 New York/30 New Jersey" language relates to the money to be paid to the guards, or the money A-O was to be reimbursed for the guards' services.  PX39.

120. Despite this arrangement, the A-O Defendants routinely overbilled Gladius by charging Gladius an hourly rate that was higher than the amounts paid by the A-O Defendants to the security guards.  See Ex. 1, Isham Decl. at ¶9.

Response: Denied.  The ICA is unclear whether the "25 New York/30 New Jersey" language relates to the money to be paid to the guards, or the money A-O was to be reimbursed for the guards' services.  PX39.

121. For example, although the A-O Defendants intentionally destroyed most of the security guards' billing records, the remaining invoices from A-O for 2010, when compared to A-O's internal financial records from that same period, establish that A-O charged Gladius approximately $700,000 more than A-O actually paid out to the guards.  Id.

Response: Admitted.

122. Gladius' estimate of overbillings was calculated by subtracting the total amount paid out to the guards by A-O (see Ex. 3, 2010 Quarterly Payment Reports at pp. 015, 025, 058, 075, 122, 189, 212) from the total amount A-O billed to Gladius in 2010 (see Ex. 1-A, 2010 A-O Invoices).  Response: Admitted.

123. For the missing three bi-monthly invoices, Gladius used the average amount of the remaining twenty-three invoices, $74,973.71, as a reasonable estimate of A-O's billings.  See id.

Response: Admitted.

124. By this calculation, A-O paid the guards approximately $1.6 million, but invoiced Gladius for almost $2.3 million in hourly guard services.  See id.

Response: Admitted.

125. DePompo admitted that she routinely destroyed the guards' invoices and any backup data for the guards' hours after she entered the total dollar amounts for each invoice into ADP, an online bill tracking system.  PX47, DePompo Tr. 1 at 87:16-87:24, 110:10-110:14, 155:16-155:23.

Response: Admitted.

126. The destroyed billing records contained critical details regarding the guards' pay, including hours worked at a particular store and the rate charged by the guard, that are not contained in the ADP records.   See id.; see also Ex. 3, 2010 Quarterly Payment Reports.

Response: Admitted, except Plaintiffs deny that the destroyed records contained "critical" details.  Plaintiffs can still calculate a just and reasonable inference of their damages from the ADP records, supplemented by the extant timesheets.  PX 64.

127. Moreover, despite DePompo's admission that "most guards got paid twenty dollars an hour," the invoices that A-O submitted to Gladius clearly contain rates that exceed the standard hourly rate usually paid by A-O to the guards.  PX46, DePompo Tr. 1 at 127:22-127:24; see generally Ex. 1-A, the 2010 A-O Invoices.

Response: Admitted, except denies those records show that most guards were paid more than $20 per hour.  PX47 127:22-24; PX64.

128. The purpose and intent of the parties as expressed in the ICA, and as admitted by the A-O Defendants, AT&T and Gladius, was for the A-O Defendants to provide armed, rather than

unarmed, security guards.  PX48, DePompo Tr. 2 at 36:15-37:5; PX46, Isham Tr. at 65:4-65:11;

PX52, Santos Tr. at 15:4-15:13, 24:16-24:22, 42:8-42:17, 120:12-120:19.

<u>Response:</u> Denied.  The ICA makes no mention of armed guards or armed security services.

PX39.

129.  AT&T also testified that it never used Gladius for unarmed assignments and relied on

Gladius specifically to provide armed off-duty officers in retail stores as a deterrent to criminal

activity.  See PX52, Santos Tr. at 15:4-15:13, 24:16-24:22, 42:8-42:17, 120:12-120:19.

<u>Response:</u> Denied in part.  The cited testimony does not say that AT&T "relied on Gladius

specifically to provide armed off-duty officers."  It does say that "the local market was looking

to put armed off-duty officers in our retail stores," (*id.,* 15:6-7), but there is no testimony that

Gladius was required to provide off duty law enforcement officers.

130.  DePompo also sent emails to AT&T that provide further evidence that she understood

Gladius and, by extension, A-O, were required to provide armed guards to AT&T retail stores.

See Wahby Decl. at Exhibit 4, various emails from DePompo to AT&T ("DePompo Emails") at

AT&T 00007.  Indeed, on February 26, 2011, the A-O Defendants notified AT&T that Gladius

was allegedly in violation of its contract with AT&T because an unarmed guard was in place at

an AT&T retail location.  See *id.*

<u>Response:</u> Denied.  The email referenced makes no mention of a breach of contract, or to the

contract terms.

131.  According to DePompo, not all of the guards carried or were qualified to carry a

weapon.  PX48, DePompo Tr. 2 at 36:15-37:5, 59:16-61:4, 61:18-62:19.

<u>Response:</u> Admitted.

132. DePompo's testimony is corroborated by at least two of the security guards who admitted they either lacked the necessary gun permits or simply did not carry a firearm while providing guard services.  See id; PX54, Miranda Tr. at 42:1-42:4; PX61, Llanes Tr. at 44:16-45:10.

Response: Admitted.

133. Article 9.5 of the ICA provides that:

> . . . for a period of twenty-four (24) months immediately following the termination of its relationship with GLADIUS it will not, without the prior written consent of GLADIUS, . . . (b) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (c) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate itself with, any business in competition with or otherwise similar to the business of GLADIUS.

Ex. 1-B, the ICA at §9.5.

Response: Admitted.

134. The A-O Defendants do not deny this non-compete is contained in the ICA.  PX48, DePompo Tr. 2 at 32:9-32:11.

Response: Admitted.

135. The non-compete clause includes a geographic restriction that makes the provision applicable to a specific territory.  Ex. 1-B, the ICA at §9.5.

Response: Admitted.

136. The territory at issue is New York, which is covered by the non-compete clause due to the amount of business Gladius does in that state.  Id.

Response: Admitted that New York is encompassed by the cited text; however that text does not state why New York is so encompassed.

137. Nevertheless, the A-O Defendants sent numerous emails and text messages to AT&T employees and representatives aggressively targeting Gladius' contract with AT&T and stating and/or implying, inter alia, that Gladius and its principals are corrupt and even involved in criminal activity.  See generally Ex. 4, DePompo Emails.

Response: Admitted.

138. For example, on February 14, 2011, while the parties were still operating under the ICA, the A-O Defendants contacted AT&T behind Gladius' back and offered to provide competing armed security guards services to AT&T:

Dear Amadeus, Happy Valentine Day,  Can you give me a call when you are free.  I have negotiated a deal with Lincoln where I would be sub contracted by them until my vendors license is approved here.  You know I have been doing all the work here in the tri state, North East region.  Instead of Gladius, I would be sub contracted by Lincoln.  Give me a call.  Gladius is looking now to find a new sub contractor here.

See id. at AT&T 00010.

Response: Admitted.

139. On February 24 and 25, 2011, the A-O Defendants contacted AT&T again and accused Gladius of engaging in unethical business practices by taking steps to replace A-O with a new subcontractor.  See id. at AT&T 00009.

Response: Admitted.

140. Later, on February 25, 2011, the same day Gladius terminated the ICA, the A-O Defendants again contacted AT&T and, in direct violation of the ICA's non-compete, asked if they should "join forces" with Lincoln in providing security services to AT&T.  See id. at AT&T

00007.

Response: Admitted.

141. On February 27, 2011, the A-O Defendants contacted AT&T again and disclosed

private details about Gladius' business practices, including the nature and type of Gladius'

licenses and personnel, accused Gladius of unethical conduct and business practices and hiring

another subcontractor that was using "bribes" to acquire qualified security guards, and

represented that AT&T was spending millions of dollars on an "unnecessary evil."  Id. at AT&T

00006.

Response: Admitted.

142. The A-O Defendants also accused Gladius of exposing AT&T to a "big liability" by

using Texas-based officers who lacked the necessary licenses and authorizations to carry a

firearm or provide security services.  Id.

Response: Admitted.

143. Finally, on March 10, 2011, the A-O Defendants contacted AT&T and again accused

Gladius and its principals of unethical conduct and "trying to make [the A-O Defendants] look

bad."  Id. at AT&T 00004.

Response: Admitted.

144. In this same communication, the A-O Defendants also continued their attempts to solicit

business from AT&T by representing that a bank was ready to finance A-O's payroll if the

AT&T contract could be reassigned from Gladius to A-O.  Id.

Response: Admitted.

145. The A-O Defendants' malicious, disparaging statements forced Gladius to expend

considerable resources to restore the good will it had built with AT&T.  See Ex. 1, Isham Decl. at ¶12.

Response: Denied.  The cited affidavit contains no evidence or resources expended to restore good will aside from a conclusory statement.

146. Article 8 of the ICA is a confidentiality clause that provides that the A-O Defendants may not disclose "business practices and procedures, budgets, investments, plans, research, joint ventures, development, investigations, studies, contracts, resources and business dealings of GLADIUS, and the clients of GLADIUS . . . all information, written or oral, acquired directly or indirectly, during and in the course of Independent Contractor's engagement with GLADIUS including, but not limited to, the financial, corporate, political or personal affairs of any person, corporation, or other entity."  Ex. 1-B, the ICA at §8.1.

Response: Admitted.

147. The confidentiality clause goes on to require the A-O Defendants to keep all information learned in the course of their engagement with Gladius confidential unless written authorization to disclose such information is obtained from Gladius.  Id. at §8.2.

Response: Admitted.

148. It further designates Gladius' financial and competitive information as confidential and protectable trade secrets and prohibits the A-O Defendants from using or retaining such information except as authorized by Gladius.  Id. at §8.8.

Response: Admitted.

149. On February 27, 2011, the A-O Defendants revealed confidential trade secrets to AT&T by disclosing that Gladius does not maintain a license to provide security in New York, but

instead uses licensed subcontractors, like A-O, to provide guard services in the New York area.

See Ex. 4, DePompo Emails at AT&T 00006.

Response: Denied.  AT&T was already aware, as of at least 2007, that Gladius, Inc. provided

guards through it subcontractor Alpha-Omega.  PX52 38:18-24, 42:18-44:19; PX3.

150. Again, on March 16, 2011, the A-O Defendants disclosed to AT&T that A-O "charged a

low rate" which allowed Gladius to earn "15 dollars every man hour for doing absolutely

nothing."  See Wahby Decl. at Exhibit 5, a March 16, 2011 email from DePompo to Santos.

Response: Admitted.

151. And, on April 4, 2011, the A-O Defendants disclosed additional confidential

information about Gladius by forwarding A-O's invoices to AT&T, which contained private

details regarding Gladius' pricing structure, business model, and payment arrangement with

A-O.  See id. at Exhibit 6, a April 4, 2011 email from DePompo to Becky De La Cruz.

Response: Denied.  The reference to the civil complaint, lack of payment, and breach of contract

are matters of public record and not confidential.  *Id.*

152. Under the express terms of the ICA, such information constitutes Gladius' confidential

and protected trade secrets and the A-O Defendants were without cause, privilege or justification

in disclosing this information to a third-party.  Ex. 1-B, the ICA at  §§8.1, 8.8.

Response: Assuming that "such information" refers to the information in paragraph 151, denied.

*See* response to paragraph 151.

153. The ICA contains multiple indemnity provisions requiring the A-O Defendants to

indemnify Gladius against claims made by the Plaintiffs.  In particular, Article 4.1 provides:

> 4.1 Independent Contractor shall indemnify, defend and hold harmless Gladius
> from any loss, damage, claim or expense, including interest, taxes, penalties, costs

and reasonable attorneys' fees, resulting from the failure of Independent Contractor or its employees, agents or sub-contractors to comply with any laws, ordinances, regulations and codes, or from a determination that Gladius is liable for salaries, benefits and/or taxes, with respect to Independent Contractor, or the employees or sub-contractors of Independent Contractor.

Id. at §4.1.

Response: Admitted.

154. Likewise, Article 4.2 obligates the A-O Defendants to indemnify Gladius as follows:

4.2 Independent Contractor should indemnify, defend and hold harmless Gladius against any and all actions, claims, demands, suits, losses, costs, damages, fines, penalties, judgments, expense (including reasonable attorneys' fees) and causes of action of every kind and character (including those of the parties and their agents and employees) directly or indirectly incurred or to be incurred and arising out of or in connection with…

(c)         Independent Contractor's failure to be in compliance with any government agency's regulatory requirements; or

(d)         any claim or lawsuit filed against Gladius by any employee or agent of Independent Contractor

(1)     seeking benefits due to employees of Gladius by virtue of their engagement

(2)     alleging any sub-contractor of Independent Contractor is not an Independent Contractor

(3)     alleging monies owed to any sub-contractor for payment or for any disputes between Independent Contractor and sub-contractor

(4)     alleging any current or former employee is not, or was not, an employee of Independent Contractor

(5)     alleging wrongful termination of this Agreement for any reason whatsoever by Independent Contractor.

Id. at §4.2.

Response: Admitted.

155. Gladius has made a demand for indemnification in the arbitration on the A-O Defendants under the ICA, but the A-O Defendants have not offered to indemnify Gladius.  See Wahby Decl. at Exhibit 7, Gladius' First Amended Arbitration Demand.

Response: Admitted.

156. Moreover, the A-O Defendants do not deny that the ICA requires them to indemnify Gladius against lawsuits like the New York action.  PX48, DePompo Tr. 2 at 23:15-23:20.

Response: Admitted.

157. The ICA contains nothing on its face suggesting the A-O Defendants or Gladius intended to confer benefits on any third-party.  See generally Ex. 1-B, the ICA.

Response: Admitted.

158. Moreover, it specifically states in Article 1.1 that the ICA shall not "be construed as creating any relationship between Gladius and Independent Contractor's employees [the Plaintiffs]."  Id. at §1.1.

Response: Admitted.

159. Furthermore, Article 4.2 of the ICA contains an indemnity provision that requires A-O and DePompo to indemnify Gladius if any of their subcontractors file a claim against Gladius for, inter alia, trying to seek benefits of Gladius employees by virtue of their engagement with A-O, alleging that the subcontractor is not an independent contractor, and alleging that money is owed to a subcontractor by A-O or for other disputes between the subcontractor and A-O.  Id. at §4.2.

Response: Admitted.

160. The A-O Defendants admit they never intended to convey a benefit on any third-party,

including the Plaintiffs, when they executed the ICA.  PX48, DePompo Tr. 2 at 22:18-23:8.

<u>Response:</u> Admitted.

161. This is consistent with the testimony from the guards, many of whom admitted they never viewed the ICA or knew it existed and had never heard of Gladius prior to this litigation. PX59, Thomas Tr. at 46:4-47:3; PX60, Howard Tr. at 38:8-12; PX63, Jackson Tr. at 41:1-41:3; PX61, Llanes Tr. at 29:15-18.

<u>Response:</u> Admitted as to some guards not being aware of the written ICA or of Gladius prior to this lawsuit; denied that the cited testimony shows any intent or consistency with Defendants' subjective intent.

162. A-O is not currently represented by counsel in this matter, as its prior firm, The Law Offices of Robert E. Brown, PC, withdrew as counsel of record on March 8, 2012.  See Dkt. No. 138, Order Granting Motion to Withdraw.

<u>Response:</u> Admitted.

163. A-O has not retained legal counsel to replace its prior attorney, which resulted in Judge Peck entering judgment against A-O in favor of the Plaintiffs on March 8, 2012.  See Dkt. No. 139, Partial Civil Judgment.

<u>Response:</u> Admitted.

164. There are also numerous individual parallel cases and administrative proceedings that have been initiated by the security guards against the A-O Defendants in connection with their failure to pay the guards.  Indeed, several guards have filed suit in small claims court (see PX48, DePompo Tr. 2 at 13:05-14:02; PX57, Alicea Tr. at 95:19-97:11; PX59, Howard Tr. at 8:15-11:21), another guard is prosecuting his claim in the Eastern District of New York (see

PX48, DePompo Tr. 2 at 15:11-15:21), and several other guards are pursuing claims for unpaid

wages with state agencies (see PX55, Miller Tr. at 6:08-7:24; PX53, Mullings Tr. 7:24-9:06).

Response: Denied. There is no evidence of any active cases or administrative proceedings

against the A-O defendants at this time other than this one.  Named Plaintiff Julio Alicea filed

his small claims action against Alpha-Omega prior to starting this lawsuit, and withdrew that

case in favor of this one.  PX 67; PX58 96:8-17.  Opt-in Plaintiff Leonard Howard filed his small

claims action for unpaid wages prior to joining this lawsuit.  PX59 50:22-51:4.  The New York

Department of Labor complaints led to a determination that the guards were subject to the FLSA,

and that Ms. DePompo and A-O owe 9 employees $8,849.75 for overtime, and owe 81

employees $59,986.14 in unpaid wages.  PX50.  A case filed by guard Gary Shmansky against

DePompo and A-O in the Eastern District of New York was settled earlier this year, but Ms.

DePompo has not complied with her obligations under the settlement.  Rozger May 9, 2012

affirmation, ¶ 5.

165. Gladius is a security company that provides, inter alia, armed security guard protection

for retail businesses.  See Ex. 1, Isham Decl. at ¶4.

Response: Admitted.

166. Gladius has customers nationwide and, from time to time, uses independent contractors

to staff the security guard needs of its customers outside of Texas.  Id.

Response: Admitted.

167. Gladius is incorporated under the laws of the State of Texas with its headquarters

located in Tyler, Texas.  See Dkt. No. 55, Pls.' Complaint at ¶26; Wahby Decl. at Exhibit 8, the

September 12, 2011 Affirmation of Herbert Isham ("Isham Aff.") at ¶4.

<u>Response:</u> Admitted.

168. Although it no longer provides security services, Gladius is still in business primarily collecting past due receivables and outstanding debts. See PX46, Isham Tr. at 19:13-19:21.

<u>Response:</u> Admitted.

169. Herbert Isham ("Isham") previously served as president of Gladius and now serves as president of Centuria, Inc. ("Centuria"). Id. at 6:25-7:6; Ex. 8, Isham Aff. at ¶4.

<u>Response:</u> Admitted.

170. Sometime in 2009 or 2010, Isham formed Centuria as a separate security company due, in part, to certain accounting advantages offered by a C corporation over an S corporation. PX46, Isham Tr. at 6:13-7:12, 31:4-31:10.

<u>Response:</u> Admitted in part. Isham also formed Centuria because of the cessation of his business partner, Joseph Branch, as well as to avoid bad publicity caused by Mr. Branch's indictment. (PX46:19:8-11, 31:11-15).

171. Centuria is incorporated under the laws of the State of Texas and maintains an operations office in Tyler, Texas and an executive office in Southlake, Texas. Id. at 8:3-8:11; Pls.' Complaint at ¶27.

<u>Response:</u> Admitted.

172. Centuria currently provides some office space to Gladius, which moved its offices from Brownsboro, Texas to Tyler, Texas after Centuria was formed and acquired office space. PX46, Isham Tr. at 26:6-27:17.

<u>Response:</u> Admitted.

173. Centuria did not merge with Gladius or assume any of Gladius' debts or liabilities. Ex.

8, Isham Aff. at ¶12.

Response: Denied.  Whether Centuria is responsible for Gladius' debts is one of the questions of

law to be decided in this lawsuit.  For facts supporting Plaintiffs claim in this respect, *see*

Plaintiff's Local Rule 56.1 Statement of Undisputed Facts, ¶¶ 12-28.

174. Gladius continues to operate independently of Centuria.  Id. at ¶10.

Response: Denied, *see* Plaintiff's Local Rule 56.1 Statement of Undisputed Facts, ¶¶ 12-28.

175. As of April 19, 2011, the date Plaintiffs filed suit, Centuria did not conduct any of the

following activities in the State of New York:  (1) maintain offices or any place of business; (2)

maintain licenses to do business; (3) appoint an agent for service of process; (4) pay or incur

New York taxes; (5) maintain a mailing address or telephone listing; (6) own or lease any real

property; or (7) maintain any bank accounts.  Id. at ¶6(a)-(g).

Response: Admitted.

176. In or about 2006, based on Gladius' representations regarding pricing, its level of

service, and the quality of its guards, AT&T entered into an agreement with Gladius to provide

armed security to certain of AT&T stores in the New York market.  PX46, Isham Tr. at

22:25-23:18.

Response: Admitted.

177. In connection with its agreement with AT&T, in or about October 2006, Gladius

approached Grace DePompo ("DePompo") about recruiting off-duty and retired police officers

to provide security services to AT&T stores in the New York and New Jersey markets.  See

PX47, DePompo Tr. 1 at 8:3-11:15.

Response: Admitted.

178. DePompo agreed, and began coordinating security services at temporary locations in December 2006.  Id. at 16:9-16:18.

Response: Admitted.

179. Almost a year later, in or about September 2007, DePompo formed A-O.  Id. at 42:7-42:19.

Response: Admitted.

180. In June of 2008, Gladius formally engaged A-O as an independent contractor to provide armed security guards for AT&T retail stores in the New York metropolitan area and parts of New Jersey.  See PX48, the ICA; see also Ex. 1, Isham Decl. at ¶¶5-6; Ex. 1-B, the ICA.

Response: Denied.  Gladius Inc. engaged A-O "a couple of months" prior to March of 2008, when it began submitting invoices to AT&T, rather than Gladius Protection Inc.  (PX20; PX 52 14:14-23, 159:12-160:10; PX 48 68:10-14).

181. The ICA, by and between Gladius and A-O and its president, DePompo, sets forth terms by which DePompo and A-O would provide "security services" for one of Gladius' customers.  See Ex. 1-B, the ICA at opening preamble.

Response: As this paragraph is identical to paragraph 106, see Plaintiffs' response to paragraph 106.

182. Although not specifically stated in the ICA, Gladius paid A-O a coordination fee of $5 for each man hour of security services billed to Gladius.  See PX48, DePompo Tr. 2 at 38:16-38:22.

Response: As this paragraph is identical to paragraph 107, see Plaintiffs' response to paragraph 107.

183. Pursuant to the ICA, the A-O Defendants regularly contracted with no less than eighty guards to provide security services to approximately twenty-three AT&T stores in New York and New Jersey.  PX47, DePompo Tr. 1 at 49:9-50:2, 72:16-73:5.

Response: As this paragraph is identical to paragraph 108 (except for the use of the shorthand "A-O Defendants"), see Plaintiffs' response to paragraph 108.

184. Carlos Miranda, John Grenawalt and Julio Alicea are all former law enforcement officers who have, for at least the past five to six years, worked part-time or full-time for A-O as security guards at various entities, including AT&T.  See PX54, Miranda Tr. at 19:1-10 and 48:7-14; PX56, Grenawalt Tr. at 14:17-16:9; PX57, Alicea Tr. at 31:7-33:21.

Response: As this paragraph is identical to paragraph 109, see Plaintiffs' response to paragraph 109.

185. Gladius properly terminated the ICA in February 2011 pursuant to the provisions found in Article 2 of the ICA.  See Ex. 1, Isham Decl. at ¶7; Exhibit 1-C to the Isham Decl., the February 25, 2011 termination email from Isham to DePompo; see also Ex. 1-B, the ICA at §2.2.

Response: As this paragraph is identical to paragraph 113, see Plaintiffs' response to paragraph 113.

186. At the time of termination, Gladius had paid the A-O Defendants millions of dollars in coordination fees and guard related invoices over the life of the ICA.  See Ex. 1, Isham Decl. at ¶7.

Response: As this paragraph is identical to paragraph 114, see Plaintiffs' response to paragraph 114.

187. Gladius terminated the ICA, in part, after discovering that the A-O Defendants had been grossly overbilling Gladius under the terms of the ICA.  See id. at ¶9.

Response: As this paragraph is identical to paragraph 115, see Plaintiffs' response to paragraph 115.

188. The ICA incorporates by reference a Compensation Agreement which establishes the rates the A-O Defendants were to pay for armed security guards.  See id. at ¶8; see also Ex. 1-B, the ICA.

Response: As this paragraph is identical to paragraph 116, see Plaintiffs' response to paragraph 116.

189. Pursuant to this agreement, the A-O Defendants were to pay no more than $25.00 per man hour for New York officers and $30.00 per man hour for New Jersey officers.  Id; see also PX46, Isham Tr. at 45:6-46:12, 55:5-55:8.

Response: As this paragraph is identical to paragraph 117, see Plaintiffs' response to paragraph 117.

190. Under no circumstances were the A-O Defendants allowed to bill Gladius more than what the A-O Defendants were paying to the security guards.  See Ex. 1, Isham Decl. at ¶8; PX46, Isham Tr. 45:6-46:12, 55:5-55:8.

Response: As this paragraph is identical to paragraph 118, see Plaintiffs' response to paragraph 118.

191. Instead, to compensate the A-O Defendants for providing and coordinating armed guard services, Gladius paid the A-O Defendants a coordination fee of $5 per man hour for each guard placed with AT&T.  See Ex. 1, Isham Decl. at ¶8; PX47, DePompo Tr. 1 at 136:21-137:20;

PX46, Isham Tr. at 42:13-43:9.

Response: As this paragraph is identical to paragraph 119, see Plaintiffs' response to paragraph 119.

192. Despite this arrangement, the A-O Defendants consistently overbilled Gladius by charging Gladius an hourly rate that was higher than the actual amounts paid by the A-O Defendants to the security guards.  See Ex. 1, Isham Decl. at ¶9.

Response: As this paragraph is identical to paragraph 120, see Plaintiffs' response to paragraph 120.

193. For example, although most of the security guards' billing records were intentionally destroyed by the A-O Defendants, the remaining invoices from A-O for 2010, when compared to A-O's internal financial records from that same period, establish that A-O charged Gladius approximately $700,000 more than A-O actually paid out to the guards.  Id.

Response: As this paragraph is identical to paragraph 121, see Plaintiffs' response to paragraph 121.

194. This estimate of overbillings was calculated by subtracting the total amount paid out to the guards by A-O (see Ex. 3, 2010 Quarterly Payment Reports at pp. 015, 025, 058, 075, 122, 189, 212) from the total amount A-O billed to Gladius in 2010 (see Ex. 1-A, 2010 A-O Invoices).  Response: Admitted.

195. For the missing three bi-monthly invoices, Gladius used the average amount of the remaining twenty-three invoices, $74,973.71, as a reasonable estimate of A-O's billings.  See id.

Response: As this paragraph is identical to paragraph 123, see Plaintiffs' response to paragraph 123.

196. By this calculation, A-O paid the guards approximately $1.6 million, but invoiced Gladius for almost $2.3 million in hourly guard services.  See *id.*

Response: As this paragraph is identical to paragraph 124, see Plaintiffs' response to paragraph 124.

197. DePompo admitted that she routinely destroyed the guards' invoices and any backup data for the guards' hours after she entered the total dollar amounts for each invoice into ADP, an online bill tracking system.  PX47, DePompo Tr. 1 at 87:16-87:24, 110:10-110:14, 155:16-155:23.

Response: As this paragraph is identical to paragraph 125, see Plaintiffs' response to paragraph 125.

198. The destroyed billing records contained critical details regarding the guards' pay, including hours worked at a particular store and the rate charged by the guard, that are not contained in the ADP records.  See id.; see also Ex. 3, 2010 Quarterly Payment Reports.

Response: As this paragraph is identical to paragraph 126, see Plaintiffs' response to paragraph 126.

199. Moreover, despite DePompo's admission that "most guards got paid twenty dollars an hour," the invoices submitted by A-O to Gladius clearly contain rates that exceed the standard hourly rate usually paid by A-O to the guards.  PX47, DePompo Tr. 1 at 127:22-127:24; see generally Ex. 1-A, the 2010 A-O Invoices.

Response: As this paragraph is identical to paragraph 127, see Plaintiffs' response to paragraph 127.

200. Since, and possibly before, Gladius terminated the ICA, the A-O Defendants have sent

numerous emails and text messages to AT&T employees and representatives aggressively

targeting Gladius' contract with AT&T and stating and/or implying, inter alia, that Gladius,

Centuria, and their principals are corrupt and even involved in criminal activity.  See Exhibit 4,

DePompo Emails at AT&T 00007.  AT&T informed Gladius of these emails prior to Gladius

terminating the ICA.   PX46, Isham Tr. at 122:15-123:18.

<u>Response:</u> Admitted.

201. For example, on February 24, 2011, the A-O Defendants contacted AT&T and accused

Gladius of engaging in unethical business practices by taking steps to replace A-O with a new

subcontractor.  See Ex. 4, DePompo Emails at AT&T 00009.

<u>Response:</u> Denied.  The unethical practices referred to in that document apparently relate to

withholding information and soliciting officers for employment at Stone Security.

202. On February 27, 2011, the A-O Defendants contacted AT&T again and disclosed

private details about Gladius and Centuria's business practices, including the nature and type of

their licenses and personnel, accused Centuria of unethical conduct and business practices,

accused Centuria of hiring another subcontractor that was using "bribes" to acquire qualified

security guards, and represented that AT&T was spending millions of dollars on an "unnecessary

evil."  See Ex. 4, DePompo Emails at AT&T 00006.

<u>Response:</u> As this paragraph is identical to paragraph 141, see Plaintiffs' response to paragraph

141.

203. The A-O Defendants also accused Gladius and Centuria of exposing AT&T to a "big

liability" by using Texas-based officers who lacked the necessary licenses and authorizations to

carry a firearm or provide security services.  Id.

Response: As this paragraph is identical to paragraph 142, see Plaintiffs' response to paragraph 142.

204. Additionally, on March 10, 2011, the A-O Defendants contacted AT&T and accused Centuria and its principals of unethical conduct and "trying to make [the A-O Defendants] look bad."  Id. at AT&T 00004.

Response: Admitted.

205. Centuria eventually entered into a separate contract with AT&T to replace Gladius as AT&T's provider of armed security services for stores located in the New York City and New Jersey markets.  PX46, Isham Tr. at 21:5-21:8, 29:25-30:18.

Response: Admitted.

206. In or about May 2011, Centuria began providing armed guard services to AT&T pursuant to this agreement.  Id.

Response: Denied to the extent this paragraph claims Gladius or Centuria ceased providing security services at any time after the contract with A-O ceased.  PX46 97:20-23; PX52 74:20-75:3.

207. Unlike Gladius, which used A-O, Centuria primarily subcontracts with Stone Security to recruit, hire, pay and manage the security guards that are placed at AT&T retail stores.  Id. at 34:1-34:12.

Response: Admitted.

208. According to Isham, Centuria hired Stone Security to provide a better and more professional level of service than Gladius had been providing to AT&T.  Id. at 35:20-36:4.

Response: Admitted.

209. A-O is not currently represented by counsel in this matter, as its prior firm, The Law Offices of Robert E. Brown, PC, withdrew as counsel of record on March 8, 2012.  See Dkt. No. 138, Order Granting Motion to Withdraw.

Response: As this paragraph is identical to paragraph 162, see Plaintiffs' response to paragraph 162.

210. A-O's refusal to retain legal counsel to replace its prior attorney resulted in Judge Peck entering judgment against A-O in favor of the Plaintiffs on March 8, 2012.  See Dkt. No. 139, Partial Civil Judgment.

Response: Admitted.

211. AT&T owns and operates approximately 142 retail stores throughout its "New York Market," which includes lower New York State, the five boroughs of New York City and Long Island.   Affidavit of Jason Rozger, dated February 11, 2012 (the "Rozger Aff."), Ex. 52 (Deposition of Amadeus Santos ("Santos Tr.") at 9:14-10:4).

Response: Admitted.

212. The retail stores sell AT&T's wireless communication, internet and television services, along with related equipment and accessories such as mobile phone, tablets, modems, and phone cases.  Santos Tr. at 13:7-14:13.

Response: Admitted.

213. Each store is individually managed by a store manager, who oversees the work of a group of AT&T employees assigned to the store, including an assistant manager and sales and customer service associates who are primarily responsible for helping customers and selling AT&T services and the store's merchandise.  Id.

Response: Admitted.

214. AT&T's store managers report to an areas sales manager, who, in turn, reports to a director of sales.  Id. at 7:21-8:12.

Response: Admitted.

215. AT&T hires these store employees, who are subject to AT&T's policies and procedures. Id. at 57:5-15, 143:8-18.

Response: Admitted.

216. Over the years, certain of AT&T's stores in the New York Market have requested or been given an on-site security presence to deter theft and other unwanted behavior during the holiday season, during special events, or in other instances.  Id. at 15:4-13, 24:23-25:5.

Response: Admitted.

217. Not every AT&T store in the New York Market has armed security guards or any security guards.  Id.; see also Declaration of Peter S. Wahby, dated April 17, 2012 ("Wahby Decl."), Ex. 9 (Declaration of Hector Cruz, dated April 3, 2012  ("Cruz Decl.") at ¶ 4); Wahby Decl., Ex. 10 (Declaration of David Mendoza, dated April 12, 2012 ("Mendoza Decl."), at ¶ 4); Wahby Decl., Ex. 11 (Declaration of Edith Mancebo, dated April 3, 2012  ("Mancebo Decl."), at ¶ 3).

Response: Admitted.

218. AT&T's stores request guards for temporary service, which could be as short as a day or as long as a month, and certain of AT&T's stores now have security on a more regular basis. Santos Tr. at 31:11-17, 46:13-22.

Response: Admitted.

219. The requests for security typically emanate from a specific store manager or assistant manager and are routed through an areas sales manager or the director of sales and ultimately to the property manager responsible for the specific location.  Id. at 16:23-17:14.

Response: Admitted.

220. The property management team is generally responsible for each store's physical location, including leasing, cleaning and other maintenance issues.  Id. At 7:8-20.

Response: Admitted.

221. After receiving requests for security from the New York Market, the property management team, along with others in the organization with responsibility for the New York Market, began reviewing AT&T's options, including hiring guards directly from the police force or going through one of AT&T's preexisting vendor relationships (e.g. Securitas, an unrelated security services company not a party to this action).  Id. at 18:24-19:9.

Response: Admitted.

222. During this process, AT&T met with several different vendors, including Gladius Protection, Inc. ("Gladius"), which had been providing security services to AT&T in other geographic areas.  Id. at 21:20-21:5.

Response: Admitted.

223. Ultimately, in or about 2006, based on the pricing and level of guard service offered by Gladius, AT&T entered into an agreement with Gladius, whereby Gladius would provide armed security guard services to certain AT&T stores in the New York Market.  Id. at 22:25-23:18.

Response: Admitted, except at that time, AT&T was known as Cingular.  PX47 11:19-24.

224. AT&T did not know, and was not concerned with, how Gladius would obtain the guards

requested, only that "if [AT&T] had a request for . . . an armed guard, that [AT&T] could give [Gladius] the address and the hours that [AT&T] needed the guards for and that [Gladius] would provide . . . an armed guard."  Id. at 24:7-22.

Response: Denied.  The cited testimony does not state that those were the only things AT&T was concerned about.

225. AT&T had no requirements for the guards except that they were to be armed, arrive on time and guard the store.  Id. at 29:14-22 and 33:23-34:2.

Response: Denied.  AT&T also required unarmed guards.  PX52 29:23-30:2.  In addition, AT&T had extensive requirements for the manner and means the guards performed their job.  *See* Plaintiffs Local Rule 56.1 Statement of Undisputed Facts, ¶¶ 31-42, 46-64.

226. AT&T did not request a specific number of guards or specific individuals and did not know which guards would be assigned to specific stores, but rather, AT&T identified for Gladius the locations, days and hours for which it needed service.  Id. at 30:15-23, 46:23-47:16, 49:19-51:6; Mancebo Decl. at ¶¶ 10, 24.

Response: Denied.  Although this paragraph is true for the most part, some AT&T store managers requested specific guards.  PX47 197:11-198:2, 198:13-199:17; PX62 28:5-14; PX63 25:3-11.

227. Guards were not hired, authorized, or asked to perform at AT&T stores any services other than armed security of the premises.   Santos Tr. at 79:18-23, 172:10-18;  Mancebo Decl. at ¶ 15; Mendoza Decl. at ¶ 12; Cruz Decl. at ¶ 14.

Response: Denied.  Some guards performed non-security tasks in the store, such as helping to move boxes (PX53 69:4-14), moving merchandise in the store (PX54 56:16-57:3), taking out the

garbage (PX55 50:22-51:12; PX56 77:1-11; PX57 40:2-9), answering customer questions (PX55 63:25-64:20), assisting customers with using the automated payments machine (PX56 71:7-23), shoveling the sidewalk (PX56 77:20-24) and assisting with deliveries (PX63 52:14-22).

228. AT&T did not manage the guards, including when they would take work breaks, when a substitute guard would be needed, or what they wore while at their post (in contrast to the dress code for AT&T employees, who were required to wear specific color pants and shirts with the AT&T logo on the front). Id. at 66:24-67:9, 68:14-69:14, 64:24-65:17, 143:8-18; Cruz Decl. at ¶¶ 6, 12-13; Mendoza Decl. at ¶¶ 6,10-11; Mancebo Decl. at ¶¶ 9, 11-13.

Response: Denied. There is overwhelming evidence that AT&T managed the guards on a day to day basis. *See* Plaintiffs' Local Rule 56.1 Statement, ¶¶ 31-58, 54-64. In addition, Mr. Santos testified that he had no firsthand knowledge of how the guards interacted with the store managers, PX52 67:23-68:2, and so his testimony is inadmissible on this point. Moreover, he testified that when he observed a guard sitting down on the job, he instructed Gladius to "have a talk" with the guard because sitting was not acceptable. (PX52:145:16-146:12, PX15).

229. AT&T did not provide guards with any specific responsibility concerning the alarm systems that were connected to displayed phones on the sales floor, the in-store security systems, or otherwise, and only wanted the guards to perform the task each was contracted to perform: "guard the store, employees and assets . . . ." Santos Tr. at 58:15-20, 62:3-20.

Response: Denied. The guards were trained in the alarm systems, and responding to those alarms was part of their duties. Plaintiffs' 56.1 statement ¶ 53-55. In addition, Mr. Santos testified that he had no firsthand knowledge of how the guards interacted with the store managers, PX52 67:23-68:2.

230. As AT&T's corporate designee testified:  "AT&T doesn't have a policy on guards and what they can do.  Again, we hired Gladius because they are a guard company and they can provide their own guidelines on what they can do, what they are able to do and not able to do." Id. at 179:4-19.

Response: Denied to the extent this statement is offered for the truth of the employment relationship between the guards and AT&T.  *See* Plaintiffs' Local Rule 56.1 Statement, ¶¶ 31-58, 54-64.

231. AT&T maintained no records of guard attendance or hours worked and received only invoices from Gladius reflecting the number of hours that unspecified guards were purportedly assigned to and present at each store.  Id. at 53:5-20, 65:18-66:15.

Response: Admitted.

232. AT&T had no responsibility for paying the guards, including rate of pay or method of payment, and the guards did not participate in any of AT&T's employee benefit options.  Id. at 85:19-86:2; Cruz Decl. at ¶ 7; Mendoza Decl. at ¶ 7; Mancebo Decl. at ¶ 9.

Response: Denied.  The guards were not paid directly by AT&T, and did not receive fringe benefits from AT&T, but AT&T's setting of the rates and payment of the invoices for the guards' work, indicates that AT&T had responsibility over the guard's pay.  Plaintiffs' Local Rule 56.1 statement ¶¶ 85-87, 94.

233. At some point, AT&T became aware that Gladius was securing guards in the New York Market through a subcontractor, Alpha-Omega Protection Services Corp. ("A-O"), and its principal, Grace DePompo ("DePompo").  Santos Tr. at 38:18-39:13.

Response: Admitted.

234. At the store level, with no AT&T directives concerning the supervision and control of contract security guards, store manager interaction with the armed guards varied generally from store to store, but store managers did not schedule, train, control, evaluate, or supervise the guards.  See generally Mancebo Decl.; Mendoza Decl.; Cruz Decl.

Response: Denied.  There is overwhelming evidence that AT&T managed the guards on a day to day basis.  *See* Plaintiffs' Local Rule 56.1 Statement, ¶¶ 31-58, 54-64; *see also* the "written directives" of PX25 and 26.

235. The store managers at AT&T's stores changed during the relevant period of time.  See Mancebo Decl. at ¶¶ 3-4, Cruz Decl. at ¶ 3, Mendoza Decl. at ¶ 3.

Response: Admitted.

236.  Store managers would not know who might show up for a scheduled guard post, and some did not even know the last names of the guards that were cycled through their stores on varying shifts by Gladius or A-O.  Cruz Decl. at ¶ 6; Mancebo Decl. at ¶¶ 8,10.

Response: Denied.  Some store managers requested particular guards, PX47 197:11-198:2, 198:13-199:17, PX62 38:5-14, PX63 25:3-11, and some guards had steady shifts in a particular store.  PX47 23:22-24:14, 73:11-17; PX59 21:5-7; PX61 22:20-23:2; PX62 24:19-25:5.

237. AT&T did not provide any guidance, training or materials for the store managers regarding the guards.  Mancebo Decl. at ¶ 12; Mendoza Decl. at ¶ 8; Cruz Decl. at ¶ 8.

Response: Admitted.

238. Store managers might identify for the guards high theft areas in the stores, but did not provide any training for the guards and otherwise left the guards alone to perform their guard duties.  Mancebo Decl. at ¶ 12; Mendoza Decl. at ¶ 8.; Cruz Decl. at ¶ 8.

Response: Denied.  There is overwhelming evidence that AT&T managed the guards on a day to day basis.  *See* Plaintiffs' Local Rule 56.1 Statement, ¶¶ 31-58, 54-64.  In addition, the AT&T store manager trained the guards on the operation of the phone alarm system.  (PX54 74:10-19; PX56 93:20-94:25; PX57 46:22-47:11), and one Plaintiff received some of the sexual harassment and alcohol use trainings that were given to the rest of the AT&T staff (PX53 40:17-41:19).

239.  Store managers provided the guards with no equipment, except, in certain cases, the key to turn off the display phone alarm system.  Cruz Decl. at ¶11; Mendoza Decl. at ¶¶9; Mancebo Decl. at ¶14.

Response: Denied.  Store managers also provided the guards with the keys to the stores.  PX59 27:4-14; PX56 49:19-25.

240.  While certain store managers would, at times, allow guards to hold the keys to the security devices attached to the phones for the day, others would never give keys to the guards.  Cruz Decl. at ¶11; Mendoza Decl. at ¶¶9; Mancebo Decl. at ¶14.

Response: Denied.  Mancebo's declaration in fact states that she would provide the guards the alarm keys, but would get them back by the end of the day.

241.  Store managers, in certain instances, did ask that a specific guard be removed from a store for conduct-related reasons (e.g., for falling asleep, or for viewing pornography, during a shift, for flirting with store employees, or for suspected theft).  Santos Tr. at 80:7-22, 147:9-148:25, 172:3-18; Mancebo Decl. at ¶¶ 18-19, 22; Mendoza Decl. at ¶ 6.

Response: Admitted.

242.  AT&T generally would make any such change requests to Gladius, and if Gladius' services at any store were ultimately deemed unsatisfactory, AT&T would obtain guard services

for that particular store from another vendor.   Santos Tr. at 94:16-99:15, 134:22-136:5.

Response: Admitted, except that on at least one occasion that request went to DePompo.  PX47 98:23-99:11.

243. In at least two instances, AT&T discontinued using Gladius (and by association, the subcontractor, A-O) for certain stores and secured armed guard services from an entirely different vendor to ensure that different guards would be used at these locations.  Santos Tr. at 94:16-99:15, 134:22-136:5.

Response: Admitted.

244. As Gladius' subcontractor, A-O was the sole entity responsible for recruiting guards, placing guards in AT&T stores, removing guards from AT&T stores and coordinating the guards' schedules to ensure that AT&T received the coverage it requested from Gladius in the New York Market.  See Rozger Aff., Ex. 48 (Deposition of Grace DePompo, dated December 12, 2011 ("DePompo Tr.2"), at 35:10-6, 21:7-25, 42:4-11).

Response: Denied.  In paragraphs 241 and 242, above, Defendants claim that requests to remove a guard generally went through Gladius.  In addition, as some AT&T store managers requested particular guards, PX47 197:11-198:2, 198:13-199:17, PX62 38:5-14, PX63 25:3-11, A-O cannot be said to be the "sole entity" placing guards in the AT&T stores.  Also, the store managers would on occasion change the guard's schedule to conform to the needs of the store, PX53 22:!4-25:1, PX54 84:1-9, PX63 40:7-18, so A-O was not the sole entity coordinating the guard's schedules.

245. A-O also was the sole entity the guards dealt with regarding rate and method of payment for guard services rendered and was the sole entity that collected documents or information from

the guards, including time sheets identifying the hours that each guard worked.  DePompo Tr.2
at 29:15-30:17, 35:10-36:14, 56:6-12.

Response: Admitted.

246. After AT&T made a request for services, Gladius would advise A-O what AT&T stores
needed coverage and for what hours, and A-O would work with guards to ensure coverage was
provided.  Id. at 37:19-38:12, 26:10-27:17.

Response: Admitted.

247. Most of the guards used by DePompo were active law enforcement officers.  See
Rozger Aff., Ex. 47 (Deposition Transcript of Grace DePompo, dated August 26, 2011
("DePompo Tr."), at 18:21-24).

Response: Denied.  Although some guards were active duty law enforcement, there is no
evidence that "most" of them were.  The cited testimony is limited to the 2006 holiday season.

248. DePompo testified that she endeavored to determine the guards' schedules about a
month in advance of the actual posts but "on a daily basis . . . [the guards] would call any minute
and say that they couldn't make it, they picked up  a better gig or something happened, and I
would have to find somebody again."  DePompo Tr.2 at 17:12-22; 24:22-25:12.

Response: Admitted.

249. To the extent that a guard was sick or could not make a post, he was to call A-O, which
would find a replacement. Id. at 42:4-11.

Response: Denied in part.  The guards were supposed to inform the store manager, as well as
DePompo.  PX47 124:21-125:23; PX53 68:4-22; PX54 37:14-23; PX55 50:10-21; PX56 53:9-
18; PX57 46:5-21; PX61 13-16.

250. DePompo admittedly exercised discretion to set the rates for the guards and did so by considering the location, lead time and other individual circumstances.  DePompo Tr. at 29:15-30:17.

Response: Admitted.

251. AT&T had no involvement in determining the rate or method of payment or if overtime was given.  DePompo Tr.2 at 58:12-20.

Response: Denied, although AT&T had no role in overtime, AT&T's setting of the rates and payment of the invoices for the guards' work, indicates that AT&T had responsibility over the guard's pay.  Plaintiffs' Local Rule 56.1 statement ¶¶ 85-87, 94.

252. A-O was the sole entity that collected documents or information from the guards, including time sheets identifying the hours each guard worked.  Id. at 35:10-36:14.

Response: Denied in part.  Although the timesheets went to A-O, AT&T did maintain logbooks in some stores about the guard's activities.  PX53 18:3-19:26; PX63 32:22-34:4.

253. A-O had the ability to -- and did -- place guards at businesses other than AT&T, as admitted by DePompo, who (a) had a contract with and provided security for a client running clothing sample shows throughout New York City; and (b) arranged for guards to be placed at a client in New Jersey.  DePompo Tr. at 34:5-12, 44:2-11.

Response: Admitted in part.  Although there was no legal or contractual impediment to A-O placing guards at businesses other than AT&T, its non-AT&T work was limited to two short term projects only requiring 1 or 2 guards.  Plaintiffs' Local Rule 56.1 Statement, ¶ 29.  Indeed, once it lost the contract with Gladius, A-O went out of business.  PX47 6:21-7:14, PX48:16:22-17:2.

254. Carlos Miranda, John Grenawalt and Julio Alicea (together the "Plaintiffs") are all former law enforcement officers who have, for at least the past five to six years, worked part-time or full-time as security guards at various entities, including AT&T.  See Rozger Aff., Exs. 54, 56- 57 (respectively, Deposition Transcript of Carlos Miranda ("Miranda Tr.") at 19:1-10, 48:7-14; Deposition Transcript of John Grenawalt ("Grenawalt Tr.") at 14:17-16:9; Deposition Transcript of Julio Alicea ("Alicea Tr.") at 31:7-33:21).

Response: As this paragraph is identical to paragraphs 109 and 184, see Plaintiffs' responses to those paragraphs.

255. Plaintiff Grenawalt worked at no less than four different AT&T stores.  Grenawalt Tr. at 25:23-25, 26:5-11, 38:24-39:3.

Response: Admitted.

256. Plaintiff Alicea worked at no less than 33 different AT&T stores.  Alicea Tr. at 35:17-36, 36:24-37:6.

Response: Admitted.

257. Plaintiff Miranda worked at no less than ten AT&T stores.  Miranda Tr. at 22:6-15.

Response: Admitted.

258. For his guard services at AT&T stores, A-O paid Grenawalt as an independent contractor on a form 1099 basis.  Grenawalt Tr. at 18:3-11.

Response: Admit that Grenawalt was paid on a 1099; deny that he was an independent contractor.  See Plaintiff's Local Rule 56.1 Statement, ¶¶ 31-58, 54-64.

259. For his guard services at AT&T stores, A-O paid Alicea as an independent contractor on a form 1099 basis.  Alicea Tr. at 12:20-13:8, 38:21-39:6.

Response: Admit that Alicea was paid on a 1099; deny that he was an independent contractor.

See Plaintiff's Local Rule 56.1 Statement, ¶¶ 31-58, 54-64.

260. For his guard services at AT&T stores, A-O paid Miranda as an independent contractor on a form 1099 basis.  Miranda Tr. at 59:25-60:16.

Response: Admit that Grenawalt was paid on a 1099 for most but not all of his services, PX54 62:7-11; deny that he was an independent contractor.  See Plaintiff's Local Rule 56.1 Statement, ¶¶ 31-58, 54-64.

261. Miranda requested to be paid as an employee through a W-2 but that request was denied and he never complained.  Id. at 61:24-62:20.

Response: Denied.  The cited testimony shows that Miranda was paid under a W-2 for two paychecks before it was stopped, and he did not know why.  The testimony does not state that the request was "denied."  In fact, DePompo testified that guards would be paid on a W-2 if they requested it; the difference between W-2 and 1099 was "not a big deal."  PX47 86:17-87:14.

262. In 2007, Grenawalt began providing armed security services at AT&T retail stores through A-O and DePompo (whom he knew from when they worked together at the New York City Police Department).  Grenawalt Tr. at 62:20-25.

Response: Admitted.

263. Grenawalt  paid for his New York State armed guard license out of pocket and also used his own gun, for which he personally maintained the permit.  Id. at 18:17-19, 1:17-84:3.

Response: Admitted.

264. At some point in 2007, an AT&T store manager informed A-O that Grenawalt was drinking alcohol during lunch breaks.  DePompo Tr. at 99:24-101:12.

Response: Admitted.

265. A-O moved him to a different AT&T location initially, but, ultimately, he ceased providing security at AT&T stores altogether and took a job with a different security company. Id.; Grenawalt Tr. at 15:13-23, 38:24-39:19.

Response: Admitted.

266. In 2009, Grenawalt was again contacted, and ultimately retained, by A-O to provide security services at AT&T stores.  Grenawalt Tr. at 15:24-16:9.

Response: Admitted.

267. Grenawalt admitted that he never provided any personal information to AT&T.  Id. at 19:2-6, 20:5-21:12.

Response: Admitted in part.  The cited testimony states that Grenawalt did not provide his resume or licenses directly to AT&T.

268. Grenawalt was assigned to store locations by A-O, not AT&T, see Grenawalt Tr. at 25:10 - 27:14, and he would sign on and off at his AT&T posts by texting A-O.  Id. at 24:1 - 25:2.

Response: Admit that Grenawalt was informed of his schedule by A-O; however, which stores received guards was decided by AT&T, not A-O.  See paragraph 226, above.

269. Grenawalt admitted that he never received any training or instructions on how to provide security services at AT&T. Id. at 54:5-11, 74:5-23.

Response: Denied.  Grenawalt was taught by AT&T employees how to use the phone alarm system.  PX56 94:19-95:11.

270. Aside from a key he used to turn off the alarm system attached to the store's display

phones, AT&T did not provide Grenawalt with any equipment.  Id. at 49:16-20.

Response: Denied.  Grenawalt also used store keys.  PX56 49:20-50:5

271. Grenawalt admitted that he relied upon his own professional judgment and experience while providing security services to AT&T.  Id. at 50:19-4, 51:12-21, 74:5-14.

Response: Admitted.

272. Grenawalt admitted that AT&T had no involvement in his work schedule or payments for his services.  Id. at 25:10-27:14, 45:25-47:2.

Response: Denied.  The cited testimony actually indicates that the work schedule was set by the AT&T store hours.

273. In terms of scheduling, except if he was running late to an assignment, Grenawalt never contacted an AT&T store manager directly, and the AT&T store managers never contacted him directly.  Id. at 54:4-10.

Response: Admitted.

274. Grenawalt reported the hours that he worked at AT&T stores directly to A-O, and never to AT&T. Id. at 24:22 - 24

Response: Admitted.

275. Grenawalt admitted that he did not view AT&T as being responsible for his pay at all and admitted that he was a contract security guard.  Id. at 45:25-47:2, 14:23-25.

Response: Denied.  The context of the cited testimony does not support that Grenawalt was a "contract" guard rather than an employee.  Nor does it support that Grenawalt viewed AT&T as not being responsible for his pay, rather as being aware that the money was owed from "Gladius Centuria."

42

276. With respect to any security-related incidents that took place at an AT&T store while Grenawalt was on duty, any incident reports prepared by Grenawalt would be provided directly to A-O and never to AT&T.  Id. at 96:9-97.

Response: Denied.  Incident reports would then be forwarded to AT&T.  PX52 109:20-110:10.

277. Grenawalt testified that, unilaterally and without authorization from AT&T, he would help customers with the AT&T store's automated payment machines, which he knew how to use from his own experience as an AT&T customer.  Id. at 71:10-72:3.

Response: Denied.  The cited testimony does not state that Grenawalt acted "unilaterally and without authorization."

278. Grenawalt admitted that his job was to be a security presence and that he never engaged in sales of AT&T products.  Id. at 70:22-71:9.

Response: Admit that he never engaged in sales of AT&T products, but deny that being a security presence were his only tasks.  PX56 71:7-23, 77:1-11, 20-24.

279. Grenawalt testified that "Grace [DePompo] was the boss.  She came and she visited locations." Id. at 63:19-64:2.

Response: Admit, but the context of that testimony was in describing the two occasions when Grenawalt actually met Ms. DePompo.  *Id..,* 61:17-19.

280. Grenawalt was informed by Grace DePompo that his services were no longer needed at AT&T stores when Gladius terminated its contract with A-O.  Id. at 32:8-12.

Response: Admitted.

281. Alicea began providing security services at  AT&T stores in 2009.  Alicea Tr. at 22:19-24.

Response: Admitted.

282. Alicea learned about the opportunity to provide security to AT&T stores through his fellow law enforcement officers.  Id. at 11:6-13, 19:16-20:11, 75:8-15.

Response: Admitted.


283. Alicea testified that he personally paid for the necessary state-sponsored training to maintain his license and that he took CPR classes on his own initiative because, while not typically required, the certification is "good to have."  Id. at 14:5-15:10, 16:6-18, 16:22-17:11.

Response: Admitted.

284. Alicea applied for a security post through A-O.  Id. at 11:6-13.

Response: Admitted.

285. Alicea was given a post at an AT&T store without ever being interviewed or providing any information to AT&T.  Id. at 15:-7; 16:3-5; 16:16-18; 17:6-17:15.

Response: Denied in part; the cited testimony does not establish that Alicea was not interviewed by anyone before starting work at AT&T.

286. Alicea admitted that AT&T was not involved in setting his schedule. Id. at 24:24-26:8, 19:13-15, 38:6-11, 24:11-17.

Response: Denied.  Although DePompo informed Alicea of his schedule, the hours he and all the guards worked was tied to the store hours.  PX52 50:10-20.

287. Alicea admitted that AT&T was not involved in tracking or recording his work hours at AT&T stores.  Id. at 19:13-15.

Response: Denied.  The cited testimony indicates that Alicea did not submit his work hours

directly to AT&T; it makes no representation about what records AT&T kept.

288. Alicea admitted that AT&T was not involved in paying him for guard services at AT&T stores.  Id.  at 13:3-8.

Response:  Denied.  The cited testimony states that AT&T did not send him a 1099 or a W-2.

289. Alicea admitted that he would advise AT&T store managers "what [his] work procedures" would be as an armed guard.  Id. at 26:16-22.

Response:  Denied.  The cited testimony does not support the proposition that Alicea told the managers what he would be doing, and not the reverse.  The testimony is in fact as follows:

> Q. Did you report to any individual at AT&T?
> A. The managers. I had to report myself, present myself, introduce myself, tell them what my work procedures are, and he would tell me what I needed to know regarding the work procedures.

290. Alicea admitted that AT&T store managers were not "hands-on" with the guards.  Id. at 109:23-110:9.

Response:  Denied in part.  The cited testimony also shows the control the managers could have over the guards: "[m]ost of them will tell you just walk around. Some of them will tell you station here."  *Id.*

291. Alicea testified that his knowledge of what not to do, like sleeping on the job, came from his experience as a security professional. Id. at 107:16-21.

Response:  Admitted, except the cited testimony only relates to sleeping on the job, not general knowledge of "what to do."

292. Alicea admitted that aside from a key that he used to turn off the store's alarm system attached to the display phones, AT&T did not provide him with any equipment.  Id. at 39:19-40:6.

Response: Admitted.

293. While Alicea had some contact with AT&T store managers regarding scheduling, such contact primarily involved informing the store manager that he would be late, as per A-O's policy.  Id. at 46:5-21.

Response: Admitted, except that some of the scheduling contact Alicea had with store managers was for other officers.  PX58 42:5-18.

294. On rare occasions, an AT&T store manager, who was familiar with Alicea, called him if a different guard did not report to the store for a post and the manager was unable to reach anyone at A-O,  and, in those instances, Alicea simply would relay the message to A-O.  Id. at 41:10-43:8.

Response: Admitted.

295. Alicea often controlled his own schedule, taking it upon himself to send other people to cover his posts.  DePompo Tr. at 106:7-12.

Response: Denied.  Alicea would call DePompo if he could not make a shift.  PX58 25:15-20. In addition, the cited testimony is inadmissible as it is not based on Ms. DePompo's personal knowledge.

296. Alicea testified that an A-O supervisor checked on his performance.   Alicea Tr. at 60:3-6.

Response: Admitted.

297. Alicea testified that he received from A-O, not AT&T, post orders that described certain policies that he would be required to follow while on duty at an AT&T store.   Id. at 30:25-31:9

Response: Admitted.

298. Alicea testified that other than occasionally taking the trash out as a favor to the store employees, he never did anything other than provide services as a security guard and never did anything relating to AT&T's underlying business of sales and customer service.  Id. at 40:6-17, 61:9-25, 110:18-19.

Response: Denied to the extent this paragraph makes a legal conclusion that security is not work relating to AT&T's underlying business of sales and customer service.

299. Alicea submitted his hours to A-O and even created his own "pay-roll sheet" to report his hours because A-O had not provided one. Id. at 17:16-18:10.

Response: Admitted.

300. Alicea testified that he never discussed wages with AT&T, because: "I don't work for AT&T."  Id. at 24:11-17.

Response: Admitted.

301. During the period that he was providing security services at AT&T stores, Alicea also was working as an "armed captain" for another security company,  Madison Security.  Id. at 31:7-33:21.

Response: Admitted.

302. Madison Security issued to Alicea the gun that he carried while providing armed security services at AT&T stores.  Id. at 67:5-25, 69:5-11.

Response: Admitted.

303. After asking DePompo for a day off, A-O terminated his services, and since then, he has not provided guard services at any AT&T stores.  Id. at 33:22-35:7.

Response: Admitted.

304. Alicea admitted that he did not discuss his termination with anyone at AT&T because he did not discuss A-O policy with anyone at AT&T.  Id. at 33:8-16.

Response: Denied.  The cited testimony does not so state.

305. In connection with his termination, Alicea filed a complaint against A-O but not against AT&T because, as he testified: "I was working for Alpha-Omega."  Id. at. 21:2-11.

Response: Admitted, except the cited testimony relates to a complaint filed with the New York Department of State.  Id.

306. Plaintiff Miranda learned of the opportunity to provide security services at AT&T stores through a recommendation.  Miranda Tr. at 12:4-13:4.

Response: Admitted.

307. Miranda submitted personal information only to A-O and was subsequently given a post at an AT&T store by A-O.  Id. at 77:10-13.

Response: Admitted.

308. Miranda testified that he purchased his own suits to wear on the job.  Id. at 66:20-22.

Response: Admitted.

309. Miranda testified that he was personally responsible for maintaining his state-issued armed guard license.  Id. at 67:20- 23.

Response: Admitted.

310. Miranda never submitted licensing information to AT&T, never submitted invoices to AT&T, and never received any information from AT&T.  Id. at 17:1-6; 18:5-12 and 28:2-14.

Response: Denied in part.  The cited testimony does not say that Miranda never received any information from AT&T.  In addition, Miranda testified that in the beginning of his employment,

the store manager would have to sign off on his timesheet.  PX54 31:6-24.

311. A-O (and not AT&T) coordinated Miranda's schedule.  Id. at 15:12-16:12, 68:5-25.

<u>Response:</u> Denied in part.  AT&T also communicated with Miranda directly about scheduling

irregularities such as a snow day.  PX54 37:14-38:23.

312. At times, Miranda would unilaterally get other guards to cover his posts.  DePompo Tr.

at 106:13-20, 107:22-25.

<u>Response:</u> Denied.  Miranda testified he had to let DePompo know if he could not make a

scheduled shift.  PX54 16:3-5.  In addition, the cited testimony is inadmissible as it was not

based on DePompo's personal knowledge.

313. Miranda had the ability to advise A-O directly when he did not want a particular

assignment or when he could not make a previously scheduled assignment.  Miranda Tr. at

15:12-16:12.

<u>Response:</u> Admitted in part.  Miranda testified that he never turned down a shift.  PX54 68:20-

25, 74:20-22.

314. The only contact Miranda had with AT&T store managers regarding scheduling was in

the event of a snow day or if he was running late, and such contact was made per A-O's

instructions.  Id. at 37:14-38:10.

<u>Response:</u> Denied.  Miranda also spoke with a store manager about another guard not being able

to make his shift.  PX54 37:14-38:23.

315. On rare occasions, an AT&T store manager contacted Miranda because a different

guard did not show up for a post and the manager could not reach anyone at A-O.  Id. at

38:11-39:4.

Response: Admitted.

316. While DePompo scheduled Miranda at AT&T stores, he took it upon himself to switch shifts with others and coordinate his own replacements.  DePompo Tr. at 106:13-20, 107:22-25.

Response: Denied.  Miranda testified he had to let DePompo know if he could not make a scheduled shift.  PX54 16:3-5.  In addition, the cited testimony is inadmissible as it was not based on DePompo's personal knowledge.

317. Miranda testified that any incident reports he filled out were given directly to A-O and not to AT&T.  Miranda Tr. at 58:24 -59:10,  83:6-8.

Response: Admitted that the cited testimony so states; however, incident reports would then be forwarded to AT&T.  PX52 109:20-110:10.

318. During the first few months that he provided guard services at AT&T stores, Miranda had the AT&T store managers confirm to A-O the hours that he worked at an AT&T store.  Id. at 30:14-32:14.

Response: Admitted.

319. After the first few months, however, he reported his work hours at AT&T stores to A-O with no confirmation from any AT&T store manager.  Id.

Response: Admitted.

320. To the extent that that he followed any direction of a store manager, he was told to do so by A-O.  Id. at 24:2-24:25, 69:1-15.

Response: Admit that Miranda was told by A-O to listen to the store manager; deny that the cited testimony states that was the only reason he followed the direction of a store manager.

321. Miranda was never told to dress a certain way by AT&T.  Id. at 37:5-13.

Response: Denied.  The cited testimony states that Miranda was never told by a store manager that he was not dressed properly.

322. AT&T never trained Miranda.  Id.

Response: Denied.  Miranda was trained by the store manager in how to use the alarm system. PX54 74:10-17.

323. AT&T never paid Miranda.   Id. at 29:16-23.

Response: Admit that AT&T never paid Miranda directly.

324. AT&T never provided information to, or received information from, Miranda.  Id. at 17:1-6, 18:5-12, 28:2-14.

Response: Denied.  The cited testimony does not say that Miranda never received any information from AT&T.

325. Miranda admitted that he relied upon his common sense and professional experience to perform his responsibilities while providing security services to AT&T.  Id. at 25:19-27:2.

Response: Admitted.

326. Miranda admitted that aside from a key he used to turn off the alarm system attached to the store's display phones, AT&T did not provide him with any equipment.  Id. at 37:2-10, 66:5-22.

Response: Admitted.

327. Miranda testified that, at times while providing guard services at an AT&T store, he might sometimes act as a go-between and hand a phone from a store manager to a salesperson who was making a sale.  Id. at 56:16-57:3.

Response: Admitted.

51

328. Miranda testified that he would greet customers, but that he was not instructed to do so by anyone at AT&T.  Id. at 72:22-73:5.

Response: Denied.  The cited testimony is that no one at AT&T told Miranda what to say in greeting customers, not that no one at AT&T told Miranda to greet customers.

329. Miranda was not licensed to carry a firearm.  Id. at 77:2-79:11.

Response: Admitted.

330. Miranda informed DePompo that he was not licensed to carry a firearm about three months after he began providing armed security services at AT&T stores.  Id.

Response: Admitted.

331. Despite not being armed, Miranda continued to provide armed security services to AT&T stores.  Id.

Response: Admitted.

332. Miranda testified that A-O placed him for guard work at Saks Off Fifth Avenue.  Id. at 19:1-10.

Response: Admitted.

333. In early 2011, Gladius terminated its sub-contract with A-O and informed AT&T that it would begin using Stone Security as a subcontractor for armed guards in the New York Market. Santos Tr. at 161:17-162:22.

Response: Admitted.

334. AT&T did not know if the guards that Stone Security used were the same as those that A-O used, because AT&T was never aware of what guards were being assigned to its stores under its arrangement with Gladius.  Id. at 75:4-11.

Response: Admitted as to Santos.  Store managers would obviously know the identity of the guards.  Plaintiffs' 56.1 statement, ¶ 31.

335. AT&T did not request information on Gladius' subcontractors and had no input on Gladius' decision to subcontract the work or which subcontractor was used.  Id. at 163:6-8, 164:22-165:4.

Response: Admitted.

336. As Gladius' armed guard subcontractor, Stone Security brought in new guards, operated differently than A-O, and changed the way armed guard services were provided to AT&T stores.  Grenawalt Tr. at 37:5-19.

Response: Denied.  The way the services were provided did not change.  Plaintiffs' 56.1 statement, ¶ 66-68.  The manner in which the guards provided the services did not change; only the work hours, paperwork reporting requirements, and a phone call-in system for the guards hours changed.  *See, e.g.,* PX53 53:2-57:21.

337. Grenawalt learned through an internet posting that Stone Security had assumed A-O's subcontracting role for Gladius, and, for about four days, provided security services to AT&T stores through Stone Security (but gave up the work because Stone Security was giving him few hours and assigning him to different stores).  Id. at 34:14-35:10, 36:2-37:22.

Response: Admitted.

338. Miranda provided security services to AT&T locations through Stone Security, but after a short time left to work for another security company, because with Stone Security, his hours at AT&T stores were similarly reduced, and he was only used as a replacement guard for when regularly scheduled guards took breaks.  Miranda Tr. at 42:9-43:23, 48:7-14.

<u>Response:</u> Admitted.

339. Miranda stopped providing security services at AT&T stores and subsequently began

providing security services for L&M Protections.  Id. at 48:7-14.

<u>Response:</u> Admitted.


Dated: New York, New York
       May 10, 2012

                                        BERANBAUM MENKEN LLP


                                        _____/s/_____
                                        Attorneys for Plaintiffs
                                        By: Jason J. Rozger
                                        80 Pine Street, 33rd Floor
                                        New York, New York 10005
                                        Tel. (212) 509-1616
                                        Fax (212) 509-8088
                                        jrozger@nyemployeelaw.com

                                        ATTORNEYS FOR PLAINTIFFS AND PROPOSED CLASS