UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

JOHN GRENAWALT, CARLOS MIRANDA
and JULIO ALISEA, on behalf of themselves
and all others similarly situated,

       Plaintiffs,

v.

AT&T MOBILITY, LLC, ALPHA OMEGA
PROTECTION SERVICES CORP., GRACE M.
DEPOMPO, GLADIUS, INC. and CENTURIA,
INC.,

       Defendants.

11 Civ. 2664 (ALC)

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS
MOTIONS FOR CLASS CERTIFICATION AND SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANT AT&T MOBILITY LLC'S
CROSS MOTION FOR SUMMARY JUDGEMENT**

Dated: New York, New York
      May 9, 2012

Respectfully submitted,

Jason J. Rozger
Christine Clarke
BERANBAUM MENKEN LLP
80 Pine Street, 33rd Floor
New York, NY 10005
Ph: (212) 509-1616
Fax: (212) 509-8088

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT   1

I.   OPT-IN PLAINTIFFS ARE PARTIES TO THIS FAIR LABOR STANDARDS ACT ("FLSA") COLLECTIVE ACTION   1

II.   THE CLASS SHOULD BE CERTIFIED UNDER RULE 23.   3

     a.   *Plaintiffs Have Satisfied the Requirements of Rule 23(a).*   3

     b.   *Plaintiffs Have Satisfied the Requirements of Rule 23(b)(3).*   4

         i.   Individualized Inquiry is Not Required to Determine Joint Employment.   4

         ii.   Individualized Inquiry is Not Required to Determine Employee Status.   7

III.   AT&T JOINTLY EMPLOYED PLAINTIFFS AND THE PUTATIVE CLASS.   8

     a.   *Plaintiffs Have Satisfied the Factors Set Forth in Zheng.*   10

         i.   Plaintiffs Used AT&T's Premises and Equipment.   10

         ii.   Plaintiffs Worked Predominantly for AT&T.   11

         iii.   A-O Had No Other Contracts.   12

         iv.   The Change of Subcontractor Did Not Affect a "Material Change" of the Class's Work.   13

         v.   AT&T Store Managers Exercised Effective Control of the Terms and Conditions of Plaintiffs' Employment.   14

     b.   *AT&T Exercised Formal Control Over Plaintiffs.*   16

IV.     PLAINTIFFS WERE NOT INDEPENDENT CONTRACTORS.                18

V.      THE COURT SHOULD EXERCISE SUPPLEMENTAL
        JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS.            22

VI.     PLAINTIFFS SHOULD BE GRANTED SUMMARY JUDGMENT
        AS TO DAMAGES.                                             23

VII.    CONCLUSION                                                 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ansoumana v. Gristede's Operating Co.*, 255 F.Supp.2d 184 (S.D.N.Y. 2003) …………5, 13, 21

*Antenour v. D&S Farms*, 88 F.3d 925 (11th Cir. 1996) …………………………………………16

*Arredondo v. Delano Farms Co*, 09 Civ. 01247,
    2010 WL 1232294 (E.D. Cal. Arp. 12, 2012),
    *class certified at* 09 Civ. 12347, 2011 WL 1486612 (E.D. Cal. Apr. 12, 2011)………..6

*Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132 (2d Cir. 2008)………..8, 17

*Brickey v. Dolencorp, Inc.* 244 F.R.D. 176 (W.D.N.Y. 2007) …………………………………24

*Brock v. Superior Care, Inc.* 840 F.2d 1054 (2d Cir. 1988)………………………………7, 19, 20

*Carter v. Dutchess Community College,* 735 F.2d 8 (2d Cir. 1984)………………………………..10

*Cruz v. Robert Abbey Inc.*, 778 F.Supp. 605 (E.D.N.Y. 1991) ……………………………………..5

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008) ………………………………..23

*Duchene v. Michael L. Celta, Inc.*, 244 F.R.D. 202 (S.D.N.Y. 2007) ……………………………..23

*Forsythe v. New York City Dept. of Citywide Administrative Services*
    733 F.Supp.2d 392 (S.D.N.Y. 2010)…………………………………………………………..17

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174 (W.D.N.Y. 2005)………………………………...4

*Gortat v. Capala Bros, INc.*, 257 F.R.D. 353 (E.D.N.Y. 2009) ……………………………………..5

*Gustafson v. Bell Atlantic Corp.*, 171 F.Supp.2d 311 (S.D.N.Y. 2011) ………………………...21

*Guzman v. VLM, INc.*, No. 07-civ-1126,
    2008 WL 597176 (E.D.N.Y. Mar. 2, 208) ……………………………………………………23

*Hale v. Stryker Orthopaedics*, 2009 WL 321579 (D.N.J. Feb. 9, 2009) …………………………3

*Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385 (N.D.N.Y. 2011) …………………..23

*Hart v. Rick's Cabart Int'l Inc.*, 09 Civ. 3043,
2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010)…………………………………………..5

*Haywood v. Barnes*, 109 F.R.D. 568 (E.D.N.C. 1986)…………………………………………5

*Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132 (2d Cir. 1999) ………………………..16, 17, 24

*Iglesias-Mendoza v. LaBelle Farm, Inc.*, 239 F.R.D. 363 (S.D.N.Y. 2007) …………………23

*Jean-Louis v. Metropolitan Cable*, 09 Civ. 6831,
2011 WL 453034 (S.D.N.Y. Sept. 30, 2011)…………………………………………10, 14, 17

*Ke v. Saiggon Grill, Inc.*, 595 F.Supp.2d 240 (S.D.N.Y. 2008) ………………………………..24

*Keady v. Nike Inc.*, 23 Fed. Appx. 29 (2d Cir. 2001) ………………………………………...…22

*Li Ping Fu v. Pop Art Int'l Inc.*, 10 Civ. 8592
2011 WL 4552436 (S.D.N.Y. 2011) ……………………………………………………25

*Lopez v. Silverman*, 14 F. SUpp. 2d 405 (S.D.N.Y. 1998) ………………………………..21

*Morlon v. Universal Guar. Life Ins. Co.*, 298 F.3d 609 (7th Cir. 2000) …………………………2

*Myers v. Hertz corp*, 624 F.3d 537 (2d Cir. 2010)
*cert. denied*, 132 S.Ct. 368, 181 L.Ed. 2d 234 (2011)...................................................2, 22

*Nobles v. State Farm Mut. Ins. Co.*, 2:10-cv-04175, 2011 WL 374021
(W.D. MO. Aug. 25,2011), *modified on reconsideration on*
*Unrelated grounds,* 10-cv-04175, 2011 WL 556344 (W.D. Mo. Nov. 15, 2011)………6

*Paz v. Piedra*, 90 Civ. 3977, 2010 WL 121103
(S.D.N.Y. Jan. 12, 20120)……………………………………………………………..5

*Rodolico v. Unisys. Cor.,* 199 F.R.D. 468 (E.D.N.Y. 2010)……………………………………3

*Rutherford Ford Corp. v. McComb* 331 U.S. 722 (1947) …………………………....13, 16

*Schwind v. EW & Associates, Inc.*, 357 F. Supp.2d 691 (E.D.N.Y. 2006) ………………….…..7

*Schultz v. Capital Intern.Sec. Inc.*, 466 F.3d 298 (4th Cir. 2006)………………..…….…17, 20, 21

*United States v. Silk*, 331 U.S. 704 (1947)…………………………………………....……..20

*Velu v. Velocity Exp. Inc.*, 666 F.Supp.2d 3300 (E.D.N.Y. 2009)………………………………22

*Winter v. Northrup*, 334 Fed.Appx. 344 (2d Cir. 2009) …………………………………...……22

*Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61 (2d Cir. 2003) …………………….…..*passim*

**STATE CASES**

*Meng v. Bell World Beauty, Inc.*, N.Y. Slip. Op. 32753
       No. 603228/08 (N.Y. Sup. Ct. August 22, 2011)………………………..…...24, 25

## PRELIMINARY STATEMENT

Plaintiffs have moved for certification of a class of security guards who performed services at AT&T Wireless stores pursuant to a contract between Defendant AT&T Mobility, LLC ("AT&T") and Defendant Gladius Inc. ("Gladius"), and a subcontract between Gladius and Defendant Alpha-Omega ("A-O"), owned by Defendant Grace DePompo ("DePompo"). Plaintiffs have also moved for summary judgment as to Plaintiffs' claims to unpaid regular and overtime wages.

This Memorandum of Law addresses Defendant AT&T's Memorandum of Law in (1) support of its cross-motion for summary judgment and/or to dismiss Plaintiffs' state law claims on jurisdictional grounds and (2) in opposition to Plaintiffs' motion for summary judgment and class certification ("AT&T Mem.").

In short, AT&T argues that it was not Plaintiffs' joint employer, that Plaintiffs were not employees of anyone, that the Court lacks supplemental jurisdiction over Plaintiffs' state law claims, that individual issues predominate over class-wide issues so as to prevent class certification, and that Plaintiffs have not proven damages sufficiently to be entitled to class-wide summary judgment. Plaintiffs respond to each claim in turn

## I.   OPT-IN PLAINTIFFS ARE PARTIES TO THIS FAIR LABOR STANDARDS ACT ("FLSA") COLLECTIVE ACTION.

To avoid confronting the evidence in Plaintiffs' favor, Defendant AT&T ignores the evidence concerning Plaintiffs who have consented to "opt in" to this action under 29 U.S.C. 216(b). AT&T claims that they "are not parties to this case" and that "Plaintiffs have abandoned their FLSA collective action" by failing to file an "opt in motion." (AT&T Mem. at 52; n. 8). There is no merit to this claim.

The Second Circuit is clear that no "opt in motion" is required in order for unnamed plaintiffs to join an FLSA action as parties. "Section 216(b) does not by its terms require any such device, and nothing in the text of the statute prevents plaintiffs from opting in to the action by filing consents with the district court" even without any court-approved notice having been sent, "so long as such plaintiffs are 'similarly situated' to the named individual plaintiff who brought the action." *Myers v. Hertz Corp*, 624 F.3d 537, 555 n. 10 (2d Cir. 2010) *cert. denied*, 132 S. Ct. 368, 181 L. Ed. 2d 234 (2011). The opt-in Plaintiffs filed consents to sue with this Court. Docket entries 2-7, 11, 18, 21, 45, 73, 129.

Defendant does not deny that they are similarly situated, as discussed in Defendant's Rule 56.1 Statement. *See, e.g.,* "Statement of Facts of Defendants Gladius Protection, Inc., Centuria, Inc., AT&T Mobility, LLC, in Further Opposition to Plaintiff' Motion for Summary Judgment and Class Certification and In Support of Their Respective Cross-Motions for Summary Judgment Against Plaintiffs" ("Def. R. 56.1"), at ¶ 236-253 (not differentiating between different guards with regard to their relationship to any Defendant). Moreover, nowhere in Defendant's Memorandum of Law does AT&T dispute that the opt-ins are similarly situated, nor has it made any motion to dismiss the opt-in Plaintiffs. They are therefore parties to this action, and evidence concerning them is relevant.

The only cases Defendant cites in support of their arguments are neither binding on this court nor relevant – one case relates only to unnamed plaintiffs in an uncertified Rule 23 *class* action, the other is a civil RICO case with nothing to do with the FLSA or collective actions. (AT&T Mem. at 52) citing *Morlon v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir.

2000); *Hale v. Stryker Orthopaedics*, 2009 WL 321579 at *6 (D.N.J. Feb. 9, 2009). Thus, there

is no authority for Defendant's claim that the opt-in Plaintiffs' testimony should be ignored.[1]

## II.   <u>THE CLASS SHOULD BE CERTIFIED UNDER RULE 23.</u>

### A.   <u>Plaintiffs Have Satisfied the Requirements of Rule 23(a).</u>

Defendants Gladius and Centuria make no arguments that Plaintiffs have failed to satisfy

the requirements of Rule 23(a), except to make the blanket statement that they "cannot." Gladius

(AT&T Mem. at 57). Defendant AT&T simply repeats its arguments concerning

"predominance" under Rule 23(b). (AT&T Mem. 57-59).

AT&T claims that Plaintiffs cannot show a common issue of law and fact because, by

raising the issue of AT&T's joint employment "Plaintiffs … beg[] the very questions that are at

issue: whether Plaintiffs are employees, and if so whether AT&T can be deemed a joint

employer." (AT&T Mem. at 58). Plaintiffs could hardly have put it better themselves– all

plaintiffs in the class share a common issue of law and fact: whether AT&T was their joint

employer.

AT&T then attempts to claim that neither typicality nor adequacy or representation are

satisfied where "a putative class representative is subject to unique defenses that threaten to

become the focus of the litigation." (AT&T Mem. at 58). Yet, AT&T fails to identify which class

representative is subject to what unique defenses, or even to identify what the unique defenses

would be.

---

[1] Even were the opt-in Plaintiffs not yet parties to the action, their deposition testimony and other evidence concerning their wages and working conditions would nonetheless be relevant to prove that common questions of law and fact predominate. See, e.g., *Rodolico v. Unisys. Corp.,* 199 F.R.D. 468, 473 (E.D.N.Y. 2010) (considering the evidence of 126 opt-ins to a hybrid ADEA class/collective action in the Rule 23 class action certification motion, where no previous collective action motion had been granted).

Rather, AT&T claims that (a) that it was not the "joint" employer of *any* members of the putative class, and (b) that *every* member of putative class was an independent contractor.

AT&T emphasizes that each Plaintiff worked for numerous AT&T stores. *See, e.g.,* (AT&T Mem. at 45). Collectively, the named Plaintiffs worked at *thirty seven* different AT&T stores. And yet, AT&T claims that "*none* of the Plaintiffs was *ever* employed by AT&T (jointly or otherwise)." (AT&T Mem. at 23) (emphasis added). This claim concerning each named Plaintiff does not differentiate between given store locations, store managers, or any other individual factor. Thus AT&T, by applying these defenses across the board to all class members, concedes that their defenses to the joint employment and independent contractor claims are not unique defenses, but rather common questions, supporting Plaintiffs' motion for class certification.

Thus, where "the question of whether [a defendant] is a joint employer under the relevant statutes appears to be an issue common to all plaintiffs and central to a resolution of the claims," "the commonality requirement has been satisfied." *Frank v. Eastman Kodak Co.,* 228 F.R.D. 174, 181-2 (W.D.N.Y. 2005).

**B.**     **Plaintiffs Have Satisfied the Requirements of Rule 23(b)(3)**

Common questions predominate over any individualized questions. Defendant AT&T claims that both the joint employment inquiry and the independent contractor analysis both require an individualized inquiry. However, the minor individual differences to which Defendant points are either insignificant, or are actually common to the proposed class.

**i.**     **Individualized Inquiry is Not Required to Determine Joint Employment.**

Defendant argues that Plaintiffs' proposed class cannot be certified because "individualized inquiry" is required to determine the question of joint employment. (AT&T

Mem. at 51). Defendant confuses "fact specific inquiry" with an "individualized inquiry." *See, e.g.,* AT&T. Mem. at 53 ("individualized factual inquiries necessary").

While Defendant is correct that the analysis is "fact-intensive" (*see, Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 76 n. 13 (2d Cir. 2003)), there is nothing about fact-specific inquiries that is compatible with those inquiries being common to a class. Were this the case, class actions would never be certified where joint employment was at issue.

And yet, numerous courts in this Circuit have certified classes in which joint employment was a common issue. *See, e.g., Hart v. Rick's Cabaret Int'l Inc.*, 09 Civ. 3043, 2010 WL 5297221 at *8 (S.D.N.Y. Dec. 20, 2010 (certifying class and denying defendant's motion to dismiss on joint employment grounds); *Ansoumana v. Gristede's Operating Co.*, 255 F.Supp.2d 184, 196 (S.D.N.Y 2003) (finding joint employment as a matter of law for some subclasses), *class certified at*,  201 F.R.D. 81, (S.D.N.Y. 2001); *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 368 (E.D.N.Y. 2009) (certifying class and granting plaintiffs' summary judgment motion as to joint employment); *Cruz v. Robert Abbey, Inc.*, 778 F. Supp. 605, 611 (E.D.N.Y. 1991) (certifying class, denying defendant's motion to dismiss as to joint employment under WARN act); *Paz v. Piedra*, 09 Civ. 3977, 2012 WL 121103 at *14 (S.D.N.Y. Jan. 12, 2012) (recommending class certification and grant of part of plaintiffs' motion for summary judgment as to joint employment issue).

Courts in other circuits have similarly certified class actions concerning joint employment issues arose. *Haywood v. Barnes*, 109 F.R.D. 568, 592 (E.D.N.C. 1986) (certifying class and finding joint employment as a matter of law where plaintiffs were directly employed by supposed "independent contractors," but where defendant "often effected … supervision by speaking to the crew leaders, who in turn spoke to the farm workers, rather than speaking

directly to the plaintiffs"); *Nobles v. State Farm Mut. Auto. Ins. Co.*, 2:10-cv-04175-NKL, 2011 WL 3794021 (W.D. Mo. Aug. 25, 2011) (denying Defendant's motion to dismiss joint employment argument, granting plaintiffs' motion for class certification), *modified on reconsideration on unrelated grounds*, 2:10-cv-04175-NKL, 2011 WL 5563444 (W.D. Mo. Nov. 15, 2011); *Arredondo v. Delano Farms Co.*, 1:09-cv-01247-LJO, 2012 WL 1232294 (E.D. Cal. Apr. 12, 2012) (denying employer's motion for summary judgment), *class certified at* 1:09-cv-01247 LJO DLB, 2011 WL 1486612 (E.D. Cal. Apr. 19, 2011).

Defendant argues that Plaintiff "cannot cite a company-wide policy or practice," and thus must rely on individualized inquiries. (AT&T Mem. at 56). However, this is simply untrue. In addition to the extensive testimony of the named Plaintiffs and opt-ins, Plaintiffs can prove:

- The post orders given to all guards, at all AT&T locations were identical (PX 25; PX 47 52:24-53:11; PX 26; PX 47 59:21-60:5);

- The post orders are written on AT&T letterhead (PX 25, PX 26);

- DePompo testified that the requirements in the post orders "ninety-nine percent of them were what AT&T required from Gladius Protection or Gladius Inc. throughout their whole relationship" (PX 47 54: 14-17);

- The post orders in effect from June 2007 through the summer of 2010 require, *inter alia*:
  - "The officer will meet with the store manager to discuss existing security measures and understand expectations for the day's events" (PX 25);

  - "Officer and store manager shall exchange contact numbers" (*Id.*);

  - "The officer's shift ends when the last person secures the property after closing" (*Id.*);

  - "The officer's shift commences one half hour before the assigned retail location opens" (*Id.*);

  - "An officer shall report all incidents, accidents, and or [sic] medical emergencies to the retail store manager" (*Id.*);

  - "A written report shall be filed with the store manager" (*Id.*);

- "Officers shall facilitate and direct customers to store sales associates when asked about products or services" (*Id.*);

- "An officer's meal breaks should be taken inside the retail location, out of the customer's view, preferably in the break room or in an area agreed upon with store management" (*Id.*);

- "If breaks are 'off-premises' the store manager shall be in agreement in terms of location, distance from store, and time" (*Id.*);

- "At the direction of store management, disorderly persons shall be asked to leave the premises" (*Id.*);

- "Any questions, comments, observations, or suggestions shall be directed only to the store manager (or his/her personal designee)" (*Id.*);

AT&T asserts that the fact that the named Plaintiffs worked at "no less than 37 different AT&T locations" somehow defeats Plaintiffs' motion for class certification. Yet, quite the opposite is true, as the Plaintiffs testified to similar policies throughout the different stores. (Pl. R. 56.1 ¶¶ 31-58, 60-64). AT&T management even confirmed at policies were common at the different stores. PX 52:77:6-87:4 (Q: Were the duties of the guards different among the stores in the New York Market where they were assigned? A: No…")[2].

### ii.    <u>Individualized Inquiry is Not Required to Determine Employee Status.</u>

Defendants make a similar error in arguing that the class should not be certified as to the issue of whether Plaintiffs were employees, rather than independent contractors. AT&T. Mem. at 55. Defendants argue again that, in the absence of any "company-wide policy or practice" with respect to classifying employees, the court must deny class certification. *Id.* at 56.

---

[2] AT&T's claim that the class should not be certified because some class members filed individual complaints belied by the fact that there are no such active claims now, and some of them were brought by some of the Plaintiffs prior to joining this lawsuit.  Plf. Response to def. 56.1 statement , para. 164.

Firstly, Defendant A-O *did* employ a "company-wide policy or practice" – that of arbitrarily classifying employees as independent contractors or employees, and thus arbitrarily issuing W-2 or1099 forms. (Pl. R 56.1 at ¶ 79). The duties of those guards paid on a 1099 and those paid on a W-2 were the same. *Id.*

Moreover, the mere fact of being classified one way or another by A-O, given that such determination was arbitrarily made, is in no way determinative, and thus no individualized defenses are available. *See, Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("an employer's self-serving label of workers as independent contractors is not controlling"); *Schwind v. EW & Associates, Inc.*, 357 F.Supp.2d 691, 702 (E.D.N.Y. 2006) ("the totality of the circumstances demonstrate that as a matter of economic reality, plaintiff was an employee of defendants within the FLSA framework at all times during plaintiff's and defendants' working relationship, irrespective of the label 'independent contractor' during certain periods. Plaintiff's duties were exactly the same when he was classified as an independent contractor as they were when he was an employee with the title Vice President of Sales.'").

There is also no question that the failure to pay overtime and wages constituted a "company-wide policy or practice." Not a single member of the putative class was paid overtime. (Pl. R. 56.1 ¶ 78). Not a single member of the class was paid wages in the period from January 28, 2011 through February 25, 2011. (Pl. R. 56.1 ¶ 84).

Thus, because Plaintiffs have satisfied the requirements of Rule 23, and Defendant has identified no individual questions that defeat predominance under Rule 23(b)(3), Plaintiffs' motion for class certification should be granted.

**III.**   **AT&T JOINTLY EMPLOYED PLAINTIFFS AND THE PUTATIVE CLASS.**

The Court should grant Plaintiffs' summary judgment motion on this issue, and deny

Defendant's, on behalf of the class as a whole.

Defendants erroneously argue that the court must take a "requisite two-step inquiry," and

decide both whether ATT exercised "formal" and "functional" control over Plaintiffs. (AT&T

Mem. at 23). This is incorrect. The Second Circuit has been quite clear that courts are not to take

such a cookie-cutter approach to the question. *See, e.g., Zheng* 355 F.3d at 75  (factors listed are

"nonexclusive and overlapping"); *Barfield v. New York City Health and Hospitals Corp.*, 537

F.3d 132, 140 (2d Cir. 2008) (same).

In *Zheng v. Liberty Apparel Co., Inc.,* the Second Circuit vacated a lower court ruling

*precisely* because the lower court insisted that the plaintiffs prove the four "formal control"

factors before considering others. 355 F.3d 61, 68 (2d Cir. 2003). In reversing, the Second

Circuit was clear: "the broad language of the FLSA, as interpreted by the Supreme Court in

*Rutherford*, demands that a district court look *beyond an entity's formal right to control* the

physical performance of another's work before declaring that the entity is not an employer under

the FLSA." *Id.* The Second Circuit held further that the four "formal control" factors "can be

*sufficient* to establish employer status" but "did not hold, nor under *Rutherford* could [it] have

held, that a positive finding on those four factors is *necessary* to establish an employment

relationship." *Id.*

Thus, as an initial matter, Defendants' analytical framework is flawed. Defendants further

argue that Plaintiffs have failed to meet each one of the ten factors identified by the Second

Circuit in *Zheng* and *Carter*. (AT&T Mem. at 24). However, once again, Defendants ignore the

fact that "the definition [of employer] is necessarily a broad one, in accordance with the remedial

purpose of the FLSA," and thus Plaintiffs are by no means required to meet each one of an exhaustive checklist of factors in order to prove that they were jointly employed by AT&T. *Zheng* 355 F.3d at 66. The Court must look at the situation as a whole, considering the "nonexclusive and overlapping set of factors" to "give content" to the statute, rather than relying on them blindly as Defendant would have. *Id.* at 75-76.

Even were Defendant correct, that Plaintiffs must prove that their employment at AT&T meet both the "formal" and "informal" control factors identified in *Zheng* (335 F.3d at 71-76) and *Carter v. Dutchess Community College* (735 F2d 8, 12 (2d Cir. 1984)), Plaintiffs have so proven, with undisputed facts.

### A.    Plaintiffs Have Satisfied the Factors Set Forth in *Zheng*.

#### i.    Plaintiffs Used AT&T's Premises and Equipment.

As argued in Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment, Plaintiffs used AT&T's premises and equipment, worked predominantly for AT&T, worked for a subcontractor with *no other* clients, experienced no material changes in their working conditions when one subcontractor was replaced by another, and were supervised day-to-day by AT&T store managers and *no one else*. Pl. Mem. p. 26-28.

Defendants cite *Metropolitan Cable* (2011 WL 453034) in support of its argument that "shared premises" are but a minor factor. (AT&T Mem. at 36). However, in *Metropolitan Cable*, the plaintiffs, cable television installers, did their work in the customers' homes, and would "visit Time Warner's premises only once per year to pick up their identification cards at Time Warner's facility." *Jean-Louis v. Metropolitan Cable*, 09 Civ. 6831, 2011 WL 4530334 at *17 (S.D.N.Y. Sept. 30, 2011). This case could not be more different. Plaintiffs showed up for work

each day at AT&T stores to do their work, and nowhere else. Ther are in fact no shared premises at all – only AT&T's.

Defendant wrongfully argues that Plaintiffs and the putative class did not receive equipment or training from AT&T. AT&T Mem. at 36. While Plaintiffs' work did not require extensive equipment, what equipment they did use in their day-to-day work was supplied by AT&T, with the exception of their own personal gun, which no Plaintiff actually used. Plaintiffs' activated and deactivated AT&T alarms, on AT&T's premises and devices, with AT&T's keys and locked and unlocked AT&T store doors with AT&T keys. (Pl. 51.6 52-55); *see also* AT&T Mem. At 36-37, (quoting transcript testimony of all three named Plaintiffs, testifying that they had AT&T keys, used AT&T alarms, and were instructed to do so by AT&T staff).[3]

### ii.    Plaintiffs Worked Predominantly for AT&T.

In attempting to prove that Plaintiffs did not "predominately" work for AT&T under the *Zheng* test (335 F.3d at 72), Defendant points only to the fact that some of the Plaintiffs and putative class were career security guards. *See* AT&T Mem. at 38-39. None of the Plaintiffs worked for multiple shifting employers on erratic schedules, as one would expect of a non-employee. Defendant merely points out that, when Plaintiffs left their jobs at AT&T/A-O, they worked for other security companies. *Id.* Were facts such as these indicative of the absence of an employer-employee relationship, then every employee who leaves one employer for another in the same industry would suddenly be an "independent contractor." Such clearly cannot be the case.

---

[3] ("Q: Did AT&T ever give you any equipment… To use on the job? A: No. Basically we had keys. We had keys to the alarms. … The manager had to give me the key.") (PX56 49:16-20) ; ("A: The only thing they provided me was a key to the alarm system when they were activated… The only training they would tell us, 'Keep an eye on the alarm systems'") (PX 58 39:19-40:6); ("A: Only keys that we have for the doors when we were on duty. Q: So at some point on duty you were provided with keys by managers of AT&T. A: Yes.") (PX 54 37:2-10).

Similarly, Defendants argue that because Alicea worked part-time for AT&T and part-time for Madison Security, he must have been an independent contractor and not an AT&T employee. *Id.* Again, the fact that he worked two jobs for two different employers does nothing to show that he was not an A-O employee, jointly employed by AT&T. Again, were Defendants' logic here to be persuasive, then all of the many Americans working two jobs simultaneously at, say, retail stores, would suddenly find themselves to be considered freelance retail workers. The logic simply does not hold, nor does it comport with the Second Circuit's reading of the term "employ" under the FLSA – which is "the broadest definition of 'employ' that has ever been included in any one act," more expansive than the common law understanding of "employee." *Zheng*, 355 F.3d at 69 (2d Cir. 2003) (citations and internal quotations omitted).

### iii.      A-O Had No Other Contracts.

Defendant argues that "the evidence adduced here establishes that the security services provided by A-O … could or did shift as a unit from one putative joint employer to another." (AT&T Mem. at 367) (internal citations omitted). The argument is specious. In reality, the evidence adduces quite the opposite: A-O existed almost exclusively to supply security guards to AT&T. A-O had no other business than supplying security guards (Pl. R. 56.1 ¶ 30). Aside from two short-term assignments requiring only 1 or 2 guards, A-O had no other business than staffing AT&T stores with guards. (Pl. R. 56.1 ¶ 29). A-O generally had somewhere in the realm of 40 guards employed at any given moment (PX 47 72:3-73:5) and supplied guards for AT&T stores beginning in 2006 (PX47 12:9-16; 22:9-19). Even Defendant can point to no more than two short-term assignments requiring one or two guards. AT&T Mem. at 38.

Given these facts, there can be no question that A-O's operation did not "shift *as a unit* from one putative joint employer to another." *Zheng* 335 F.3d at 72. Nor could it. Indeed, once

A-O lost its contract with Gladius/Centuria, and thus could not supply guards to AT&T stores,

A-O went out of business. PX 48 16:22-24. The facts in this case illustrate the import of this

factor of the joint employment analysis perfectly – where a subcontractor exists *solely* to

function as a middle-manager for a single employer, and that middle-manager is terminated, the

employees are left without any recourse whatsoever for their unpaid wages. While an entity

"ha[s] the right to outsource its requirement for [certain] services to an independent contractor,"

it does "not have the right to use this practice as a way to evade its obligations under the FLSA

or the New York Minimum Wage Act." *Ansoumana*, 225 F.Supp.2d at 196.

### iv.     The Change of Subcontractor Did not Affect a "Material Change" of the Class's Work.

AT&T claims that Plaintiffs "were not tied to AT&T" and "effectively ceased working at

AT&T stores immediately or soon after Gladius terminated its subcontracting relationship with

A-O. AT&T Mem. at 41. This is simply untrue. In fact, many guards continued working after

Stone Security took over the subcontract, performing the exact same duties they had done before,

and in some cases in the exact same store. (Pl. R. 56.1 ¶ 67, 68).

The "economic reality" of Plantiffs' and class members' day to day working lives did not

change. In fact, at AT&T representative testified that once Stone Security became the

subcontractor, there was no change in service. (PX 52 74:20-75:3).

Once again, Defendant's own motion papers cite evidence that the actual sub-contractor

supplying the guards to AT&T stores made virtually no difference to the guards' lives –

"Grenawalt admitted that he did not know Stone Security was supplying guard services to AT&T

stores; [and] that Stone Security had its own guards that were not linked to A-O." (AT&T Mem.

At 41. If the change in subcontractors had any true "material changes," one would expect a long-

time AT&T security guard such as Greenewalt to at least notice the difference or to know which

guards were supplied by Stone and which by A-O. *See Zheng* at 71, *citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729-30 (1947). The fact that, say, Alicea was fired in no way indicates that he hadn't been an AT&T employee because he was fired, as Defendant argues. The same is true of the fact that Miranda stopped coming to work when one of his employers – A-O – told him not to. Shortly thereafter, when Stone took over subcontracting responsibilities, he resumed his work, exactly as he had before. The fact that he later quit over a dispute concerning whether he could receive a weapons license has literally no bearing on his working relationship with AT&T.

Defendants contend that the fact that Plaintiffs worked fewer hours at different AT&T stores after A-O ceased working with AT&T defeats a showing of joint employment. (AT&T. Mem. at 42). However, the purported changes to Plaintiffs' working conditions were akin more the changes one experiences working for different supervisors than for different employers. Defendants correctly contend that an entity is a joint employer where, when the intermediary contractor changes, "the **same** employees would continue to do the *same* work in the **same** place." (AT&T Mem. at 41) (emphasis in original), quoting *Zheng*, 355 F.3d at 74. The fact that some Plaintiffs worked in different AT&T locations can hardly be dispositive, where the exact same employees continued to provide the exact same services at *AT&T Wireless stores*, whether at the same physical store or not. Moreover, many guards *did* work in the same physical store. (PX 53 55:5-8; PX 59 41:8-22; PX 60 49:6-14; PX 63 44:20-25).

v.     **AT&T Store Managers Exercised Effective Control of the Terms and Conditions of Plaintiffs' Employment.**

Defendants correctly note that the question of whether Plaintiffs worked a line job is a factor which "might apply with somewhat less vigor where, as here, the parties are engaged in

providing a service rather than manufacturing a product." (AT&T Mem. At 39), *citing*

*Metropolitan Cable*, 2011 WL 4530334 at *19.

Moreover, the close relationship between AT&T store managers and Plaintiffs' shows

that the guards were, in fact, integral to the store's functioning and were not in some way

independent of the store. Defendants further correctly quote Grenawalt, stating that "we

physically had to close and secure the alarm doors and make sure the alarms are done at night.

And you were responsible for the overall security of the employees." AT&T Mem. at 40, *quoting*

Grenawalt Tr. At 70:22-723. Moreover, some Plaintiffs and putative class members greeted

customers upon their arrival at the store, helped move boxes, moved merchandise in the store,

took out the garbage, answered customer questions, assisted customers with the automated

payment machines, shoveled the sidewalks, and assisted with deliveries. (Pl. R. 56.1 at 57, 59).

These were not mere freelancers – they were store employees, representing the store to

customers, and assisting other employees in ensuring the smooth day-to-day operations of the

AT&T stores.

Finally, AT&T argues that, rather than supervise Plaintiffs, the AT&T store managers

merely ensured "that AT&T obtained the 'contractual warranties of quality and time of delivery"

of their contract with AT&T. (AT&T Mem. at 43). In the service industry, that phrase means

"management" by any reasonable understanding of the word. AT&T store managers scheduling

requirements superseded those of A-O. Store managers could personally contact guards to

inform them of the hours they were to work, told them where to stand, told them what to pay

attention to, determined whether Plaintiffs could or could not sit down, reprimanded guards for

sitting down, told them when they could and could not take meal and rest breaks and told them

where they could and could not eat their lunch. (Pl. R. 56.1 at 36-40, 42, 46).

Most tellingly, Plaintiffs and class members had no contact at all with A-O or DePompo except to verify by phone or text message that they had arrived at their posts every day. (Pl R. 56.1 at 43). Their only day-to-day supervision came from store managers. Some Plaintiffs never even met DePompo in person – the only supervisors the ever met were the AT&T store managers. DePompo herself considered the guards to be "working for the store managers." (Pl. R. 56.1 at 31).

The fact that different managers exercised their control in different ways is irrelevant. What matters is that hthose managers had the authority to exercise that control. *See Herman v. RSR Sec. Services Ltd*, 172 F.3d 132, 139 (2d Cir. 1999). Defendant's dismissal of the day to day supervision of the guards as mere quality control misunderstands the purpose of this degree-of-supervision factor – to determine whether the entity had "*effective* control of the terms and conditions of plaintiff's employment." *Zheng*, 355 F.3d at 74 (emphasis added), *citing Rutherford*, 331 U.S. 726, 67 S.Ct. 1473 (finding joint employment where the supervisor "never attempted to control the hours of the [plaintiffs," but whose requirements effectively required Plaintiffs to work certain hours) and *Antenor v. D&S Farms*, 88 F.3d 925, 934 (11th Cir. 1996) (finding joint employment and supervision where the entity told the subcontractor how many employees to bring each day, determined the precise moment when work would commence each day, were free to directly delay or stop the workers from working, and "had the ability indirectly to assign work to specific workers.").

### B.     AT&T Exercised Formal Control Over Plaintiffs.

Demonstrating that AT&T exercised functional control over Plaintiffs is sufficient to show both joint employment and employee (as opposed to independent contractor) status. *Zheng* 355 F.3d at 75-6 (directing courts to "look[] beyond a defendant's formal control over the

physical performance of a plaintiff's work" and focus instead on the "economic realitiy."). The Supreme Court has found one entity to have employed another where the defendant did not hire or fire the employees, did not set their hours, and did not pay them. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 726, 67 S.Ct. 1473 (1947), *cited in Zheng¸*355 F.3d at 71.

Nonetheless, AT&T *did* exercise formal control over Plaintiffs and the putative class. As stated in Plaintiffs' motion papers, AT&T had the right to request that certain guards work at certain stores and thus had the power effectively hire and fire guards[4] – as AT&T could direct that guards not work at AT&T stores, and as A-O had no other clients, such guards would be fired. Pl. Mem. at 28. AT&T also effectively determined Plaintiffs' rate of pay by determining the hourly rate to be paid to Gladius[5], sometimes going so far as to keep some of the Plaintiffs' employment records in the form of log books, and directly controlled Plaintiffs' schedules and conditions of employment (as stated above, Section IIIA5).

In arguing that Plaintiffs were not employed by AT&T, Defendant completely ignores the fact that multiple courts have found security guards in virtually identical positions to the Plaintiffs to have been jointly employed by the guarded entity. *See, e.g., Herman*, 172 F.3d at 139 (where the guarded entity only "occasional[ly] supervised and controlled employee work schedules and conditions of employment" and "was involved in the assignment of guards to some work locations."); *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 306 (4th Cir. 2006) (discussed in more detail, *infra*). *See also Forsythe v. New York City Dept. of Citywide*

---

[4] Defendants do not contest this, admitting that "a store manager might request from A-O a particular guard" and "might ask that a guard be removed from a store for misconduct." (AT&T Mem. at 25). Defendants further admit that Plaintiff Grenawalt was banned for a time from working at AT&T stores (AT&T Mem. at 26).

[5] *See Barfield,* 547 F.3d at 132 ("[t]he fact that Bellevue calculated the hours Barfield worked and tht it then paid the agencies an hourly rate for those hours, so that the agencies, in turn, paid Barfield an hourly rate for the exact same hours, indicates that Bellevue exerted some control over Barfield's pay.").

*Administrative Services*, 733 F.Supp.2d 392, 398 (S.D.N.Y. 2010) (denying summary judgment

on joint employer claim under Title VII's more restrictive definition of "employer").

Defendants mistakenly rely on *Jean-Louis v. Metropolitan Cable Communications* for the

contention that AT&T merely "affected" Plaintiffs' hours. (AT&T Mem. at 28), citing

*Metropolitan Cable Communications, Inc.*, 2011 WL 4530334, at *11. That case involved

service technicians who worked would be called for discrete service jobs, neither on Time

Warner's premises nor under their supervision.. *Id.* The court found no joint employment

because "if Time Warner does not send Metro any work orders for jobs between 3 and 4 p.m., no

Metro technicians perform those jobs." *Id.*

This case is decidedly different – Plaintiffs worked at AT&T stores every day that those

stores were open, when AT&T personnel wanted them to (*Id.* ¶ 42, 46), reported to AT&T

personnel immediately upon arrival (Pl. R. 56.1 ¶ 40), were told when and where to take rest and

meal breaks (*Id.* ¶ 38-9), were told where to stand and what to pay attention to. (*Id.* ¶ 36).

## IV.    PLAINTIFFS WERE NOT INDEPENDENT CONTRACTORS.

Defendants' claim that Plaintiffs are independent contractors, despite being lengthy, is

patently false. In fact, the New York State Department of Labor found that A-O and AT&T's

security guards were not exempt from the overtime provisions of the FLSA, and thus were

employees. (Pl. R. 56.1 at 80, PX 50).

Indeed, since Plaintiffs have already shown that they are AT&T's joint employees, they

have already shown that they are employees rather than independent contractors. Just as with the

joint employment test, the test of whether someone is an independent contractors is one of

"economic reality" and "[t]he factors that have been identified by various courts in applying the

economic reality test are not exclusive" but rather "the test concerns the totality of the

circumstances [such that] any relevant evidence may be considered, and mechanical application of the test is to be avoided." *Brock.* 840 F.2d at 1059.

In *Brock*, the Second Circuit held that the plaintiffs were employees as they "had no opportunity for profit or loss" and their investment in the business was negligible." *Id.* There, the employees were "free to decline a proposed referral [to a position] for any reason."[6] *Id.* at 1057; (AT&T Mem. at 46) ("Plaintiffs … had the ability to choose what assignments they wanted and had the option of turning down an assignment with no repercussions").  Here, of course, the class members were paid hourly – they had no chance for a share of A-O or AT&T's profits, nor could they lose money.

In *Brock*, the Court found that "the fact that workers are skilled is not itself an indicative of independent contractor status" as "a variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees under the FLSA." *Id.* at 1060. Plaintiffs here, in fact, exercised no initiative in locating work opportunities – they were assigned at the sole discretion of AT&T and A-O. The nurses in *Brock* presumably because qualified to nurse prior to the employment in question, just as Plaintiffs and the putative class in this case received their relevant licenses and permits prior to their work for A-O and AT&T.

In *Brock*, the employees in question did not even rely on the defendant for their primary income – in that case most employees "work[ed] for Superior Care only a small percentage of the time," "earn[ed] relatively little from Superior Care (88% earned less than $5,000 from Superior Care in 1982), and few maintain[ed] continuing relationships with Superior Care." *Id.* at 1060. In the instant case, Plaintiffs and class members had a much more durable relationship

---

[6] However, no guard testified to ever actually refusing any assignment.  Five testified they never refused an assignment; see PX58 25:10-12, PX53:79:25-80:1, PX63 18:19-25, PX61 18:9-12, and PX54 68:20-25, 74:20-22.

with AT&T and A-O, with many guards working more than 40 hours per week and many (Pl. R. 56.1 at 77), and many working for years at a time (for example, Grenawalt worked straight from 2009-2011 (Def. R. 56.1 ¶ 266. 280); Alicea worked from 2009 -2011 (Def. R. 56.1 ¶ 281, 303); Miller worked from 2006 or 2007 to 2011 (PX 55 9:11-12); and Thomas worked from 2007 through 2011 (PX 60 13:13-15)).

In *Brock*, the Second Circuit thought it was "significant that [the Defendant] had treated its taxed nurses as employees and that these nurses perform exactly the same work as the nontaxed nurses." *Id*. Indeed, in the present case, workers were assigned W-2 and 1099 forms (and were therefore taxed or non-taxed) in a completely arbitrary manner, as there was literally no difference in the work performed by the W-2 and 1099 employees. (Pl. R. 56.1 at 79).

Defendant's arguments that Plaintiffs and the putative class exercised independent skill and initiative sufficient to render them independent contractors because, say, they had independent "knowledge of what not to do, like sleeping on the job," stretches credulity. (AT&T Mem. at 48).

In *Schultz* (466 F.3d at 308) the Fourth Circuit found security guards to be jointly employed by the guard agency and the guarded entity – and found all the employees to be employees, not independent contractors, under the factors set forth in *United States v. Silk* (331 U.S. 704 (1947)). In *Schultz*, the court found the guards to be employees despite the fact that "there were no doubt occasions when the agents were required to exercise independent judgment (such as determining whether a particular visitor appeared suspicious)," because the guards did have instructions – telling them where to walk and what to check. *Id.* Similarly, though guards may have had the ability to turn down shifts, they were employees because "there is no evidence the agents could exercise or hone managerial skill to increase their pay" and "there was no way

an agent could finish a shift more efficiently or quickly in order to perform additional paid work." *Id.* The court completely discounted the fact that the agents had to secure their own licenses because licensing was required under law, whether a guard was an employee or independent contractor, and thus could not constitute an investment in their own business. *Id.* The court found it particularly instructive that some of the guards chose to stay with the primary contractor, even after the subcontractor was replaced. *Id.* ("When CIS took over the detail, it hired the agents who were already working on the prince's detail."). Finally, the court took note of the fact that the subcontractor "was formed specifically for the purpose of supplying the Prince's security detail, which appears to have been CIS's only business function during the period relevant to this case" and "[t]he agents were  thus a principal part of CIS's business." *Id.*

The case at hand could hardly be more similar: Plaintiffs had no real "initiative" and they were given instructions by AT&T on where to stand and what to pay attention to. (Pl 56.1 ¶ 36). Guards could choose to turn down shifts, though they never did. However, they could hardly have increased their pay by guarding the stores better or more efficiently. Rather, they worked regular, hoursly shifts. PX 62 24:19-25:17. Guards procured and maintained their own gun licenses, but such licenses are more akin to a driver's license than a substantial investment in an independent business. Some guards remained with AT&T regardless of who the subcontracting agency was, and when Stone took over the contract, Stone hired many of the guards already guarding AT&T locations. Pl. 56. 1 ¶67. Finally, A-O "was formed specifically for the purpose of supplying [AT&T]'s security detail, which appears to have been [A-O]'s only business function during the period relevant to this case" and Plaintiffs and the putative class "were thus a principal part of [A-O]'s business." *See Schultz*, 466 F.3d at 308.

Defendant's argument that the standards for employee status under the New York Labor Law ("NYLL") are different from those under the FLSA is simply incorrect. *Ansoumana,* 255 F.Supp.2d at 189 ("New York Labor Law and the FLSA embody similar standards with respect" to employee status and joint employment), *citing Lopez v. Silverman*, 14 F.Supp.2d 405, 411 n. 4 (S.D.N.Y. 1998); *Gustafson v. Bell Atlantic Corp.*, 171 F.Supp.2d 311, 325 (S.D.N.Y. 2011) ("We therefore hold that plaintiff is an 'employee' under the broad definition of the FLSA, and is therefore entitled to overtime pay … under New York Labor Law 198(3) beginning November 1992" without an independent analysis of New York law). *But see Velu v. Velocity Exp., Inc.* 666 F.Supp.2d 300, 307-8 (E.D.N.Y. 2009) ("Although slightly different than the FLSA inquiry, the standard for determining a worker's status as an employee or independent contractor under New York State Labor Law is similar, and accounts for some of the same factors" but focusing more on "the degree of control exercised by the purported employer over the results produced or the means used to achieve these results.").

## V.   THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS

As described above (Section I), Plaintiffs have hardly "abandoned" their FLSA collective action, as Defendants claim. As stated above, a plaintiff need not make any initial "conditional certification" motion in order for an action to proceed collectively under the FLSA. *Myers*, 624 F.3d at 555 n. 10. Plaintiffs' claims under the FLSA are also far from "insubstantial," as Defendant claims. AT&T Mem. at 15. In fact, the FLSA overtime claims for the named Plaintiffs and opt ins equals over $54,000, not including liquidated damages, interest, or attorneys fees. PX 64.

Thus, Defendant's arguments concerning the "manipulation" of this Court's jurisdiction are simply unfounded. Ten individuals seek relief under federal law for substantial unpaid

overtime wages. Their  claims are "substantially identical" to their own State law claims, as well as that of the putative class. *Winter v. Northrup*, 334 Fed. Appx. 344, 346 (2d Cir. 2009). Forcing all ten FLSA Plaintiffs to relitigate the exact same case in its entirety would defeat "the interests of judicial economy, convenience, fairness to litigants, and comity." *Keady v. Nike, Inc.*, 23 Fed.Appx. 29, 32 (2d Cir. 2001).

Defendant argues that, for unspecified reasons, this Court will be unable to construe issues of New York law applicable to damages – despite the fact that Defendants themselves refer to *numerous* New York Federal District Court cases in which courts have done just that – exercised supplemental jurisdiction over state wage claims, and decided the amount of damages to be awarded under state law. AT&T Mem. at 20.

In fact, "district courts in the Second Circuit routinely allow hybrid wage and hour suits with opt-in FLSA collective actions alongside opt-out Rule 23 class actions." *Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385, 401 (N.D.N.Y. 2011) ("The underlying factual bases for the federal and state claims are identical in this case. The claims are based on the same allegedly unlawful policies, applied in the same uniform manner to all hourly employees. It would be neither convenient nor economical to relitigate these policies in state court…. Lastly, comity is no hurdle to supplemental jurisdiction as NYLL largely parallels the FLSA…"). *See also Duchene v. Michael L. Celta, Inc.*, 244 F.R.D. 202, 204 (S.D.N.Y. 2007) ("[C]ourts in the Second Circuit routinely certify class aciotn[s] in FLSA matters so that New York State and federal wage and hour claims are considered together."); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 164 (S.D.N.Y. 2008) (permitting hybrid action based on the overwhelming precedent in the Second Circuit supporting certification of simultaneous NYLL class actions and FLSA collective actions); *Guzman v. VLM, Inc.*, No. 07-civ-1126, 2008 WL 597186 at *10

(E.D.N.Y. Mar. 2, 2008) ("[I]t is routine for courts in the Second Circuit to certify state labor law classes in FLSA actions."); *Iglesias-Mendoza v. LaBelle Farm, Inc.*, 239 F.R.D. 363, 374-75 (S.D.N.Y. 2007) (rejecting defendant's contention that supplemental jurisdiction should not be exercised over NYLL claims in a simultaneous FLSA collective action and rule 23 NYLL suit); *Brickey v. Dolencorp, Inc.*, 244 F.R.D. 176, 179 (W.D.N.Y. 2007) ("Rule 23 and FLSA actions are routinely prosecuted together…").

## VI.   PLAINTIFFS SHOULD BE GRANTED SUMMARY JUDGMENT AS TO DAMAGES.

Defendant disputes that the class is entitled to overtime pay, but concedes that the amount of that overtime for the class is $140,238.17. (Def. R. 56.1 response to ¶ 92). Defendant also admits that unpaid wages due the class may be calculated by totaling the mounts due for the last two pay periods in PX 45. (Defl. R. 56.1 Response to ¶ 82. Defendant argues only that liquidated damages should not be applied.

Liquidated damages are granted under the FLSA where an employer "showed reckless disregard for the matter of whether its conduct was prohibited." *Herman,* 172 F.3d at 141. Moreover, the purpose of liquidated damages under the FLSA is to "compensate[e] … the employee occasioned by the delay in receiving wages caused by the employer's violation." *Ke v. Saigon Grill, Inc.*, 595 F.Supp.2d 240, 261 (S.D.N.Y. 2008), *quoting Herman*, 172 F.3d at 142 (2d Cir. 1999). In this instance, AT&T jointly employed plaintiffs and the putative class by controlling the terms and conditions of their work, and benefited from such work, and yet admits to keeping no timesheets or other records concerning the employee. AT&T Mem. at 34. This, despite the fact that at least one Plaintiff complained to AT&T store managers about wage violations. PX 53 38:18-39:9.

Under the NYLL, the employer has the burden of proving that employees are *not* entitled to liquidated damages, by proving a "good faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Lab. Law § 663(1). The only New York state court to have reached a decision on the retroactive application of the new amendments (requiring the employer to carry the burden of proving they need not pay liquidated damages) held that it was applicable retroactively. *Meng v. Bell World Beauty, Inc.*, N.Y. Slip OP. 32753, No. 603228/08 (N.Y. Sup. Ct. August 22, 2011), PX 65. Thus, Defendant incorrectly states the law applicable to Plaintiffs claim. AT&T Mem. at 60 ("under the operative version of the NYLL..").

Defendant has failed to offer any such evidence of such a good basis to believe it was complying with the law.

Defendant complains that Plaintiffs and the putative class cannot recover liquidated damages under both the FLSA and NYLL, arguing that it constitutes a double recovery for the same harm. However, courts in this Circuit have held differently. While Defendant cites a "split" in the courts, the fact is that "[m]ost courts in this Circuit hold that a plaintiff may recover both forms of liquidated damages." *Li Ping Fu v. Pop Art Int'l Inc.*, 10-civ-8592 (DLC)(AJP), 2011 WL 4552436 at *4 (S.D.N.Y. Sept. 19, 2011). This is because the two forms of liquidated damages "serve fundamentally different purposes, as stated above and argued in Plaintiffs' moving papers.

Finally, Defendant argues that liquidated damages under the NYLL should not be applied at 100% for the entire six-year period. Defendants' argument that the amendment to the NYLL allowing for 100% liquidated damages should not be applied retroactively simply ignores the fact that only New York court to have construed the amendments has held otherwise, as

"remedial statutes are given retroactive construction," and nothing about the new amendments

indicates that it should be treated differently. *Belle World* at 5.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' respectfully request that this Court certify the case as a

class action and grant summary judgment to the Plaintiffs on all claims against AT&T.

Dated:  New York, New York
       May 9, 2012                         Respectfully submitted,

                                  By:         /s/

                                        Jason J. Rozger
                                        Christine Clarke
                                        BERANBAUM MENKEN LLP
                                        Attorneys for Plaintiffs
                                        80 Pine Street, 33rd Floor
                                        New York, New York 10005
                                        Ph: (212) 509-1616
                                        Fax: (212) 509-1616