UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

JOHN GRENAWALT; CARLOS MIRANDA
and JULIO ALICEA, on behalf of themselves and
all other similarly situated,

      Plaintiffs,        11 Civ. 2664 (ALC)

 -against-        **AMENDED OPINION AND ORDER**

AT&T MOBILITY, LLC, ALPHA OMEGA
PROTECTION SERVICES CORP., GRACE
DEPOMPO, GLADIUS, INC. and CENTURIA
INC.

      Defendants.

-----------------------------------------------------------X

**ANDREW L. CARTER, JR., United States District Judge:**

  This case presents a tangled web of claims and cross-claims. Plaintiffs John Grenawalt, Carlos Miranda and Julio Alicea (collectively, "Plaintiffs"), former security guards, bring claims under different theories against a motley crew of defendants: Alpha-Omega Protection Services Corporation ("A-O"), and its principal, Grace DePompo ("DePompo" and, together with A-O, the "A-O Defendants"), who directly employed Plaintiffs as temporary security guards; AT&T Mobility ("AT&T"), the alleged joint employer, in whose New York and New Jersey stores Plaintiffs acted as security guards; Gladius, Inc. ("Gladius"), a now-defunct provider of security services that contracted with AT&T to provide security services in AT&T stores and with A-O Defendants to actually coordinate and make security guards available to fulfill Gladius's contract with AT&T; and Centuria, Inc. ("Centuria"), Gladius's alleged successor-in-interest.

1

BACKGROUND

I.  Procedural History

Plaintiffs filed their suit on April 19, 2011 against A-O Defendants, AT&T, Gladius and Centuria. Citing inability to pay, A-O dismissed its counsel on March 8, 2012 and has been without counsel ever since (Dkt. No. 138). On March 8, 2012, Magistrate Judge Peck entered default judgment against A-O in favor of Plaintiffs for $818,000 because a corporation may not appear *pro se* in federal court. (Dkt. No. 139).

Plaintiffs allege that they are owed regular and overtime wages for their services as security guards in AT&T stores in the New York metro area. Against Gladius, Plaintiffs seek summary judgment and class certification of their claim that they are third-party beneficiaries of the agreement between A-O and Gladius. Plaintiffs seek class certification and summary judgment on their Fair Labor Standards Act (FLSA) and New York Labor Law (NYLL) claims against AT&T.

Defendant Gladius brings cross-claims against Alpha Omega for breach of contract, unjust enrichment, fraud and business disparagement and brings a motion to compel arbitration against Plaintiffs. In the alternative, it seeks summary judgment against Plaintiffs on the ground that Plaintiffs are not third-party beneficiaries, and against A-O because it is not represented by counsel. Gladius also seeks to dismiss Plaintiffs' motion for class certification of the third-party beneficiary claims.

Defendant Centuria seeks dismissal in favor of arbitration on Plaintiffs' successor-in-interest claim. In the alternative, it seeks summary judgment against Plaintiffs on the ground that there is no successor-in-interest liability in this case, and against A-O because it is not

represented by counsel. Centuria also seeks to dismiss Plaintiffs' motion for class certification of the successor-in-interest claims.

Defendant AT&T seeks summary judgment on Plaintiffs' claims for unpaid wages and unpaid overtime wages, or in the alternative, dismissal of Plaintiffs' state law class action claims on jurisdictional grounds and denial of denying Plaintiffs' motion for class certification on the FLSA and NYLL claims.

II. Facts[1]

Gladius Meets AT&T[2]

Defendant Gladius is a security company that provides, inter alia, security guard protection for retail businesses. Though Gladius is based in Texas, it has customers nationwide and sometimes outsources to staff the security guard needs of its customers outside of Texas.

Defendant AT&T owns and operates approximately 142 retail stores throughout its "New York Market," which includes lower New York State, the five boroughs of New York City and Long Island. (PX52 at 9:14-10:4). The retail stores sell AT&T's wireless communication, internet and television services, related equipment and accessories such as mobile phone, tablets, modems, and phone cases. (*Id.* at 13:7-14:13). Each store is individually managed by a store manager, who oversees the work of a group of AT&T employees assigned to the store, including an assistant manager and sales and customer service associates who are primarily responsible for helping customers and selling AT&T services and the store's merchandise. *Id.*

---

[1] The stated facts rely heavily on Plaintiffs' and Defendants' Rule 56.1 Statement of Material Facts (Dkt. Nos. 154, 168(II), respectively) and Counterstatements (Dkt. Nos. 161, 168(I), respectively). "PX__" refers to exhibits attached to the Affidavit of Jason Rozger (Dkt. No. 152).

[2] Gladius first contracted with AT&T's immediate predecessor, Cingular.

Certain of AT&T's stores in the New York Market requested or had been given an on-site security presence to deter theft and other unwanted behavior during the holiday season, during special events, or in other instances. (*Id.* at 15:4-13, 24:23-25:5). However, not every AT&T store in the New York Market has armed security guards or any security guards. (*See* Defs. Rule 56.1 Stmt. ¶ 217). The length of time of a given security detail depends on store need, and can vary between periods as short as a day, as long as a month or on a more regular basis. (PX52 at 31:11-17, 46:13-22).

After receiving requests for security from the New York Market, AT&T met with several different vendors, including Gladius, which had been providing security services to AT&T in other geographic areas. (*Id.* at 21:20-21:5). In or about 2006, AT&T entered into an agreement with Gladius to provide security to certain of AT&T stores in the New York market. (*Id.* at 22:25-23:18).

Gladius Meets DePompo

In or about October 2006, DePompo met the principals of Gladius, Joe Branch and Herbert Isham, at a Private Investigator state test in New York. In or about December 2006, DePompo was contacted about the possibility of her helping Gladius Protection, Inc. ("GPI") fulfill an agreement with Cingular (now AT&T) to post security guards in some of their New York and New Jersey stores during the holiday season. GPI subcontracted with BCC Investigations ("BCC"), an operation run by Branch's uncle, and used BCC's license to provide security services. As a recently retired police officer, DePompo reached out to officer networks to find officers willing to work security in their off-hours.

In January 2007, GPI asked DePompo to reprise coordination of officers for security services for a more regular contract GPI had achieved with Cingular, AT&T's predecessor. DePompo's coordinating duties included assigning officers to their posts, attendance, availability, making sure the guards had the manager's information. (PX 47 at 20:15-21). Although DePompo coordinated the guards, she did so for BCC who then was directly accountable to GPI. In or about April 2007, DePompo incorporated A-O, but still continued to coordinate guards through BCC. During this time, the guards received their wages from BCC, funded ostensibly by GPI. DePompo was paid as an independent contractor for BCC. The A-O Defendants regularly contracted with no less than eighty guards to provide security services to approximately twenty-three AT&T stores in New York and New Jersey. (PX47 at 49:9-50:2, 72:16-73:5).

The Independent Contractor Agreement (ICA)

On June 24, 2008, Gladius and A-O entered the Independent Contractor Agreement ("ICA"). The ICA makes no mention of the fact that Gladius paid A-O a coordination fee of $5 for each hour of security services billed to Gladius. (*See* PX48 at 38:16-38:22; PX46 at 44:4-10). Nor does it mention that DePompo or A-O would be providing armed guards to the AT&T stores. (PX39; PX46 at 64:14-65:3). To DePompo's understanding, the ICA was a continuation of the previous relationship. (PX48 at 57:3-58:11; PX47 at 172:7-25).

It is unclear what the established pay rate was for the guards. The ICA incorporates by reference a Compensation Agreement that establishes the rates were $25 for New York officers and $30 for New Jersey officers, but it is disputed whether the "25 New York/30 New Jersey"

language refers to the money to be paid to the guards, or the total amount A-O was to be reimbursed for the guards' services. (*See* PX39).

Additionally, the ICA contains an arbitration clause that "any controversy or claim arising out of or relating to this Agreement, or breach of it, is to be settled by arbitration. . ." (PX39, at § 7). The ICA contains nothing on its face suggesting the A-O Defendants or Gladius intended to confer benefits on any third-party, (*see generally id.*), and states in Article 1.1 that the ICA shall not "be construed as creating any relationship between Gladius and Independent Contractor's employees [the Plaintiffs]." (*Id.* at §1.1).

Scope of Guard Services at AT&T

Generally, AT&T did not request specific guards or know which guards would be assigned to specific stores. Instead, AT&T identified for Gladius the locations, days and hours for which it needed service. (PX52 at 30:15-23, 46:23-47:16, 49:19-51:6; Mancebo Decl. at ¶¶ 10, 24.) Occasionally, however, some AT&T store managers requested specific guards. (PX47 at 197:11-198:2, 198:13-199:17; PX62 at 28:5-14; PX63 at 25:3-11). In turn, Gladius would advise A-O which AT&T stores needed coverage and for what hours, and A-O would work with guards to ensure coverage was provided. (PX48 at 37:19-38:12, 26:10-27:17). Likewise, if an AT&T store manager had an issue with guard performance, he or she would tell the AT&T property manager, who would then contact A-O or Gladius. (PX52 at 70:15-71:7). AT&T would report grievances such as viewing pornography in the store on AT&T computers, sitting down or sleeping on the job, failing to guard against theft, and repeatedly arriving late in this manner. (*See* Defs. Counterstatement ¶ 32). DePompo recalls only one occasion where a store

manger contacted her directly about a guard: when Plaintiff Grenawalt was drinking alcohol during his lunch breaks and then returning to work. (PX47 at 97:23-10:18).

DePompo admittedly exercised discretion to set the rates for the guards and did so by considering the location, lead time and other individual circumstances. (PX47 at 29:15-30:17). Guards generally did not report to AT&T for scheduling unless it was to report that they were sick or running late (PX57 at 46:5-21) or for other officers (*see id.* at 42:5-18). Occasionally, an AT&T store manager, who was familiar with Plaintiff Alicea, called him if a different guard did not report to the store for a post and the manager was unable to reach anyone at A-O, and Alicea would relay the message to A-O. (*Id.* at 41:10-43:8; s*ee also* PX54 at 38:11-39:4 (same for Miranda)).

A-O, through DePompo recruited and hired the security guards, collected personal information about the each guard during the hiring process and required each guard to maintain the appropriate licenses. (*See* Defs. Counterstatement ¶ 32). DePompo distributed written post orders from 2007, on AT&T's letterhead (PX25) to the guards. (Pltfs. Rule 56.1 Stmt ¶ 47). Subsequent written post orders effective the summer of 2010, on A-O letterhead, (PX26) were consistent with the earlier ones in that they instructed the guards to coordinate breaks with the store manager or assistant, to meet with the store manager to discuss security measures and the day's events, and to exchange phone numbers with the manager. (Pltfs. Rule 56.1 Stmt ¶ 48). After being hired, however, the guards had minimal contact with A-O, only verifying with a phone call or text message that they were at their shift. (PX47 at 28:5-8; PX56 24:6-14). Some guards never even met DePompo in person. (PX55 at 61:10-14; PX61 at 15:2-5; PX62 at 23:11-19, 56:13).

Guards were not asked to perform at AT&T stores any services other than armed security of the premises. (PX52 at 79:18-23, 172:10-18; Mancebo Decl. at ¶ 15; Mendoza Decl. at ¶ 12; Cruz Decl. at ¶ 14.) But some guards did on occasion help with moving boxes (PX53 at 69:4-14), moving merchandise in the store (PX54 at 56:16-57:3), taking out the garbage (PX55 at 50:22-51:12; PX56 at 77:1-11; PX57 at 40:2-9), answering customer questions (PX55 at 63:25-64:20), assisting customers with using the automated payments machine (PX56 at 71:7-23), shoveling the sidewalk (PX56 at 77:20-24) and assisting with deliveries (PX63 at 52:14-22) on their own volition. Some guards also greeted customers when they came into the store. (PX26; PX54 at 73:22-74:20; PX55 at 63:15-24; PX57 at 61:2-10; PX60 at 39:20-40:4, 77:12-18). Guards were expected to wear a suit and tie, or a sweater and slacks. (Defs. Counterstatement ¶ 51). The guards wore nothing that identified them as A-O employees or AT&T employees. (*Id.*)

AT&T store managers told guards that food and drink were not permitted on the sales floor and directed one guard to eat in the front of the store due to the number of robberies. (*See* Pltfs. Rule 56.1 Stmt ¶ 38).

In certain cases, store managers provided the guards—including Plaintiffs Alicea and Miranda—with the key to deactivate the display phone alarm system. (PX57 at 39:19-40:6; PX54 at 74:10-17; Cruz Decl. at ¶ 11; Mendoza Decl. at ¶ 9; Mancebo Decl. at ¶ 14.) or provided guards with the keys to the stores. (PX59 at 27:4-14; PX56 at 49:19-25). The manager instructed the guards how to use the alarm key. These keys were always returned to the store manager at the end of the night. (*Id.*)

8

AT&T maintained no records of guard attendance or hours worked and received only invoices from Gladius reflecting the number of hours that unspecified guards were purportedly assigned to and present at each store. (PX52 at 53:5-20, 65:18-66:15).

AT&T paid Gladius for security services, but the guards never submitted their invoices to AT&T. Instead, they submitted the invoices directly to DePompo. (*See* Defs. Counterstatement ¶ 32).

A-O had the ability to place guards at businesses other than AT&T and occasionally did so. (PX47, DePompo Tr. 1 at 34:5-12 (security for clothing sample sales in New York City), 44:2-11 (providing guard for a pipeline company in New Jersey)). These projects however were short-term projects only requiring 1 or 2 guards.

Plaintiff-Specific Facts About AT&T Guard Service

Plaintiffs Grenawalt, Miranda and Alicea are all former law enforcement officers who have worked part-time or full-time as security guards at various entities, including AT&T. (*See* PX54 19:1-10, 48:7-14; PX56 at 14:17-16:9; PX57 31:7-33:21.) Plaintiffs all were paid by A-O on a form 1099 basis. (PX56 at 18:3-11, PX57 at 12:20-13:8, 38:21-39:6, PX54 at 59:25-60:16.) However, Miranda was paid with W2s for two paychecks. (PX54 at 62:7-11).

a. Plaintiff Grenawalt

In 2007, Plaintiff Grenawalt began providing armed security services at AT&T retail stores through A-O and DePompo, a former colleague at the New York City Police Department. (PX56 at 62:20-25). Grenawalt did not provide his resume or licenses directly to AT&T. (*Id.* at 19:2-6, 20:5-21:12). Grenawalt worked at no less than four different AT&T stores. (*Id.* at 25:23-25, 26:5-11, 38:24-39:3). Grenawalt paid for his New York State armed guard license out of

pocket and also used his own gun, for which he personally maintained the permit. (*Id.* at 18:17-19, 1:17-84:3).

In terms of scheduling, except if he was running late to an assignment, Grenawalt never contacted an AT&T store manager directly, and the AT&T store managers never contacted him directly. (*Id.* at 54:4-10). Grenawalt reported the hours that he worked at AT&T stores directly to A-O, and never to AT&T. (*Id.* at 24:22-24).

At some point in 2007, an AT&T store manager informed A-O that Grenawalt was drinking alcohol during lunch breaks. (PX47 at 99:24-101:12). A-O moved him to a different AT&T location initially, but, ultimately, he ceased providing security at AT&T stores altogether and took a job with a different security company. (*Id.*; PX56 15:13-23, 38:24-39:19). In 2009, Grenawalt was again contacted, and ultimately retained, by A-O to provide security services at AT&T stores. (PX56 at 15:24-16:9). Grenawalt provided security services to AT&T stores through Stone Security for about four days but left because Stone Security was giving him few hours and assigning him to different stores. (*Id.* at 34:14-35:10, 36:2-37:22).

b. Plaintiff Miranda

Plaintiff Miranda submitted personal information only to A-O and was subsequently given a post at an AT&T store by A-O. (*Id.* at 77:10-13). Miranda worked at no less than ten AT&T stores. (PX54 at 22:6-15). Miranda testified that he was personally responsible for maintaining his state-issued armed guard license. (*Id.* at 67:20-23), but Miranda was not licensed to carry a firearm. (*Id.* at 77:2-79:11). During the first few months that he provided guard services at AT&T stores, Miranda had the AT&T store managers confirm to A-O the hours that he worked at an AT&T store. (*Id.* at 30:14-32:14). Afterwards, he reported his work hours at

AT&T stores to A-O without confirmation from any AT&T store manager. (*Id.*) Besides AT&T, A-O placed him for guard work at Saks Off Fifth Avenue. (*Id.* at 19:1-10). After Stone Security replaced A-O, Miranda continued to provide security services to AT&T locations, but after a short time left to work for another security company, because his hours were reduced and he was only used as a replacement guard when regularly scheduled guards took breaks. (*Id.* at 42:9-43:23, 48:7-14).

    c. Plaintiff Alicea

Plaintiff Alicea began providing security services at AT&T stores in 2009. (PX57 at 22:19-24). Alicea worked at no less than 33 different AT&T stores. (*Id.* at 35:17-36, 36:24-37:6). Alicea testified that he personally paid for the necessary state-sponsored training to maintain his license and that he took CPR classes on his own initiative. (*Id.* at 14:5-15:10, 16:6-18, 16:22-17:11). Madison Security issued to Alicea the gun that he carried while providing armed security services at AT&T stores. (*Id.* at 67:5-25, 69:5-11). Alicea applied for a security post through A-O. (*Id.* at 11:6-13) and was never interviewed by anyone at AT&T (*Id.* at 15:-7; 16:3-5; 16:16-18; 17:6-17:15).

Alicea admitted that DePompo informed Alicea of his schedule, but ultimately that the hours he worked were tied to the store hours. (Pltfs. Counterstatement ¶ 256). A-O fired Alicea after he asked DePompo for a day off. (*Id.* at 33:22-35:7). Since then, he has not provided guard services at any AT&T stores. (*Id.*)

Gladius Terminates Contract With A-O

Gladius terminated the ICA in February 25, 2011 pursuant to the provisions found in Article 2 of the ICA. (*See* Isham Decl. at ¶7; *Id.* Ex. 1-C; *Id.* Ex. 1-B, ICA at §2.2). At the time

11

of termination, Gladius had paid the A-O Defendants millions of dollars in coordination fees and guard-related invoices over the life of the ICA. (See Isham Decl., Ex. 1 at ¶7). Gladius alleges that the A-O defendants engaged in overbilling and intentional destruction of billing records for the guards. By Gladius's estimate, A-O paid the guards approximately $1.6 million, but invoiced Gladius for almost $2.3 million in hourly guard services. DePompo admitted that she routinely destroyed the guards' invoices and any backup data for the guards' hours after she entered the total dollar amounts for each invoice into ADP, an online bill tracking system. (PX47 at 87:16-87:24, 110:10-110:14, 155:16-155:23).

In addition, Gladius claims that the A-O Defendants provided at least some unarmed guards, in contravention of the purported understanding between A-O Defendants and Gladius (and separately between Gladius and AT&T) that only armed off-duty officers would be on detail at AT&T. On February 26, 2011, the A-O Defendants notified AT&T that an unarmed guard was in place at an AT&T retail location. *See id.* Gladius believes that this and other emails from A-O Defendants to AT&T were an effort by A-O Defendants to disparage it in AT&T's eyes and compete against Gladius for the AT&T contract, in violation of the non-compete provision of the ICA. Gladius alleges similar disparagement throughout February and March 2011.

<u>Gladius Principal Forms Centuria</u>

Sometime in 2009 or 2010, Herbert Isham formed Centuria as a separate security company due, in part, to certain accounting advantages offered by a C corporation over an S corporation. Plaintiffs allege Isham was additionally motivated to avoid bad publicity caused by the indictment of his business partner, Mr. Branch. (PX46 at 19:8-11, 31:11-15). Centuria is

incorporated under the laws of the State of Texas and maintains an operations office in Tyler, Texas and an executive office in Southlake, Texas. (*Id.* at 8:3-8:11; Second Am. Compl. at ¶27). Centuria currently provides some office space to Gladius. (PX46 at 26:6-27:17). Additionally, many of the current Centuria employees had worked for Gladius prior to transitioning to Centuria. (Pltfs. Rule 56.1 Stmt ¶¶ 22-25). Although it no longer provides security services, Gladius is still in business primarily collecting past due receivables and outstanding debts. (*See* PX46 at 19:13-19:21). Centuria paid at least one of A-O's invoices. (*Id.* at 76:17-77:8; PX47, DePompo Tr. 1 at 132:13-133:19).

Centuria Meets AT&T

Centuria eventually entered into a separate contract with AT&T to replace Gladius as AT&T's provider of armed security services for stores located in the New York City and New Jersey markets. (PX46 at 21:5-21:8, 29:25-30:18).[3] Unlike Gladius, which used A-O, Centuria primarily subcontracts with Stone Security to recruit, hire, pay and manage the security guards that are placed at AT&T retail stores. (*Id.* at 34:1-34:12). Isham contends that Centuria hired Stone Security to provide a better and more professional level of service than A-O. (*Id.* at 35:20-36:4).

A-O Fails to Pay Guards

The guards were not paid for the last two months of their employment: from January 28, 2011 through February 25, 2011. (Pltfs. Rule 56.1 Stmt ¶ 69). On May 26, 2011, the Department of Labor sent a letter to DePompo concerning a recent investigation into FLSA violations at A-

---

[3] Although Defendants' Statement of Material Facts claims that Centuria entered its contract with AT&T in May 2011, Plaintiffs Grenawalt and Miranda worked for Stone Security, albeit temporarily, after A-O was terminated in February 2011. (PX56 at 34:14-35:10, 36:2-37:22; PX54 at 42:9-43:23, 48:7-14).

O. The guards were owed overtime back wages, back wages, and total unpaid wages in the amount of $68,815.89. (PX50). This suit followed.

## DISCUSSION

I consider first whether AT&T is a joint employer for the purposes of FLSA and NYLL. Then I consider the question of whether to compel arbitration over Plaintiffs' third-party beneficiary and successor-in-interest claims against Gladius and Centuria.

I. Joint Employment

A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On cross-motions for summary judgment, the court must consider each motion independently of the other and when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. *Sciascia v. Rochdale Village, Inc.*, 851 F. Supp. 2d 460 (E.D.N.Y. 2012) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Zaccaro v. Shah*, 746 F. Supp. 2d 508 (S.D.N.Y. 2010). *See also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d

Cir. 1987) ("In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant.")

B. Relevant Law

The FLSA requires that "[e]very employer shall pay to each of his employees . . . wages not less than" the prevailing minimum wage. 29 U.S.C. § 206(a)(1). FLSA further provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Similarly, the NYLL requires that "[e]very employer shall pay to each of its employees for each hour worked a wage of not less than" the prevailing minimum wage. N.Y. Labor Law § 652(a). NYLL further prohibits employers from No employer shall make "any deduction from the wages of an employee," except in accordance with state and federal law or if expressly authorized in writing by the employee. *See* N.Y. Labor Law § 193.

I will first consider whether AT&T is a joint employer under the FLSA. The FLSA and NYLL define employment almost identically. *Compare* 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."), *with* N.Y. Lab. Law § 2(7) (" 'Employed' includes permitted or suffered to work."). Consequently, courts in this circuit "hold that the New York Labor Law embodies the same standards for joint employment as the FLSA." *Paz v. Piedra*, No. 09 Civ. 03977(LAK)(GWG), 2012 WL 121103, at *5 (S.D.N.Y. Jan. 12, 2012) (citing *inter alia, Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 278 (E.D.N.Y.2005) (citing cases)).

In relevant part, FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee. . . " 29 U.S.C. § 203(d). "Because the

statute defines employer in such broad terms," ultimately, it "offers little guidance on whether a given individual is or is not an employer." *Herman v. RSR Security Services Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999). Instead, FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles, in order to effectuate the remedial purposes of the act." *Barfield v. New York City Health and Hospitals Corp.,* 537 F.3d 132, 141 (2d Cir. 2008) (internal citations and quotation marks omitted). Accordingly, the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in "economic reality rather than technical concepts" determined by reference not to "isolated factors, but rather upon the circumstances of the whole activity." *Id.* (citing *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473 (1947)). The goal of the economic reality test, and of this court considering a finding of joint employment, is "expos[ing] outsourcing relationships that lack a substantial economic purpose, but it is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61, 76 (2d Cir. 2003).

In *Carter v. Dutchess Community College*, the Second Circuit identified four factors relevant to the joint employment inquiry: "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.'" 735 F.2d 8, 12 (2d Cir. 1984) (quoting *Bonnette v. Calif. Health & Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir. 1983)) (collectively, "*Carter* factors").

In *Zheng*, the Second Circuit acknowledged that while the *Carter* factors exemplify formal control, they might be inadequate to determine "the circumstances of the whole activity viewed in light of economic reality," 355 F.3d at 71; *id.* at 69 ("We did not hold... that a positive finding on those four factors is *necessary* to establish an employment relationship," only that they "can be sufficient.") Thus, district courts should consider other factors as a measure of functional control (collectively, "*Zheng* factors"):

> (1) whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the putative joint employer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

*Id.*

Lastly, a court is "also free to consider any other factors it deems relevant to its assessment of the economic realities." *Id.* at 72. While this is a fact-intensive inquiry, summary judgment is appropriate in favor of some entities alleged to be joint employers. *Jean-Louis v. Metropolitan Cable Communications, Inc.*, 838 F. Supp. 2d 111, 119 n. 4 (S.D.N.Y. 2011) ("Nothing... casts doubt on the propriety of treating joint employment as a question of law where there are no genuine issues of material fact requiring a jury trial.")

C. Formal Control (*Carter*) Factors

1. Power to hire and fire employees

The first *Carter* factor is whether the purported joint employer had the power to hire and fire Plaintiffs. *Carter*, 735 F.2d at 12. Plaintiffs contend that AT&T had the power to hire and

fire Plaintiffs because store managers could request that specific store managers take shifts at a store and conversely, could request that some guards not be scheduled for a particular store. But this does not, without more, rise to the level of ability to hire and fire. For complaints about guards, AT&T would pass along the message to Gladius who would inform A-O of the need for another guard. In the most standard way of beginning an employment relationship, AT&T's interactions with Plaintiffs are nonexistent: AT&T does not review resumes or otherwise aid in the selection of guards. In short, AT&T had no role in the initial decision to employ the guards.

There is more ambiguous evidence that AT&T had a hand in whether a guard could be fired. (*See* PX47 DePompo Tr. 1, at 97:23-103:21). AT&T did not fire any guard directly. DePompo most clearly stated that she did not fire anyone (*id.* 97:23-98:26), but then explained that sometimes she would have to tell guards their "services are no longer needed," (*id.* at 98:5-22). These requests, according to DePompo, came from Gladius or a store manager. (*Id.*) However, it seems that the ultimate decision to fire a guard remained with DePompo, not AT&T or even Gladius. For instance, instead of firing a guard, she might simply have him relocated to another store. (*Id.* at 102:9-21). This was certainly the case with Grenawalt. Even after AT&T reported directly to DePompo that Grenawalt had been drinking on the job, Grenawalt "removed himself," then returned to A-O—and AT&T—months later:

> Q Did the manager ask you to replace [Grenawalt]?
> A The inference was there, I don't remember if he actually did ask me. I would assume he did.
> Q As a result of that conversation what would you do?
> A At that point I think I called John and I spoke to him and he understood, I don't think I had to verbally say to him you are drinking, he knew and he removed himself. I may have moved him to a couple of locations because I knew he needed but it didn't work out for a while.
> Q He wasn't fired permanently at that point?

A That is correct. I like John. I said if he straightens himself out. He called me a couple months later. I said, you okay? He said yeah, I said we'll give you a try. I have no problem with that.

PX47, DePompo Tr. 1, at 100:17-101:12.

Notably, AT&T did not have a say when A-O allowed Grenawalt to return. Because the incident did not result in Grenawalt's permanent termination even for such a serious offense, it is debatable whether AT&T actually had the authority to fire the guards.

The reality that AT&T did not have the authority to fire employees is made more apparent when compared to *Jean-Louis*. There, the court found no evidence of authority to hire and fire where the purported joint employer, a cable and telecommunications provider, could de-authorize a particular technician of the installation subcontractor from providing in-home cable installations for failure to ground, a process to reduce the risk of electrocution. *Jean-Louis*, 838 F. Supp. 2d at 125. The court reasoned that de-authorization was a "limited power" even though the contractor "would as a matter of course terminate any employee" who did not meet the safety standards. *Id.*

Here, the assertion that AT&T had the authority to fire the guards is even less reasonable where a specific store location could request that a guard not be scheduled there and the guard continued to work for A-O and guard AT&T stores, albeit at a different location. In short, the guards were not, as a general rule, categorically banned from doing security at AT&T. Grenawalt actually returned to AT&T for a while and for a few days when Stone Security was the new security subcontractor. Thus, AT&T did not have the power to hire and fire the guards, and the first *Carter* factor does not favor a finding of joint employment.

    2. Supervision and control of employee work schedules or conditions of employment